DUFFY, Douglass M., Appellee,

v.

**WHEELING PITTSBURGH STEEL CORP., Appellant.**

No. 83–1776.

United States Court of Appeals,
Third Circuit.

Argued Jan. 26, 1984.

Decided July 10, 1984.

Paul A. Manion (argued), Manion, Alder & Cohen, P.C., Pittsburgh, Pa., for appellant.

John B. Langel (argued), Elizabeth W. Fox, Ballard, Spahr, Andrews & Ingersoll, Philadelphia, Pa., for appellee.

Before ADAMS and GARTH, Circuit Judges and COHEN, District Judge.[*]

## OPINION OF THE COURT

GARTH, Circuit Judge:

Plaintiff Douglass Duffy brought suit against his former employer, Wheeling-Pittsburgh Steel Corporation ("Wheeling-Pittsburgh") under the Age Discrimination in Employment Act, 29 U.S.C. § 621, *et seq.* (1975) ("ADEA").[1] The district court held that Wheeling-Pittsburgh's discharge of Duffy violated the ADEA, based on the court's findings that Duffy had established a prima facie case of age discrimination and that Wheeling-Pittsburgh's proffered reason for discharging Duffy was a "mere pretext." The questions presented on this appeal are (1) whether the district court applied proper legal precepts in holding that a pretextual justification is equivalent to a finding of intentional discrimination under the ADEA; and (2) whether the district court's finding that Wheeling-Pittsburgh's justification for discharging Duffy was a pretext was clearly erroneous. We affirm, holding that there was no error of law and the district court's findings of fact were not clearly erroneous.

### I.

Duffy had been employed as a salesman in the Philadelphia district office of Wheeling-Pittsburgh and its predecessor company from 1955 until 1980 when Wheeling-Pittsburgh terminated his employment as part of a 15% reduction in work force necessitated by weak economic conditions in

---

[*] Honorable Mitchell H. Cohen, United States District Judge for the District of New Jersey, sitting by designation.

1. The ADEA makes it unlawful for an employer "to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age ..." 29 U.S.C. § 623(a)(1).

the steel industry. Duffy was 59 years of age when his employment was terminated. Prior to May, 1980, there were six salesmen in the Philadelphia district.[2] Wheeling-Pittsburgh terminated the four oldest and most highly paid salesmen, including Duffy.

## II.

We address first Wheeling-Pittsburgh's argument that the district court misapplied legal standards in finding intentional discrimination. In order to recover under the ADEA, a plaintiff must prove by a preponderance of the evidence that age was "a determinative factor" in the employer's decision. *See Smithers v. Bailar*, 629 F.2d 892 (3d Cir.1980); *see also Lewis v. University of Pittsburgh*, 725 F.2d 910 (3d Cir.1983) (applying same standard in Title VII context). Duffy need not prove that age was the employer's sole or exclusive consideration but must prove that "age made a difference" in that decision. *Smithers*, 629 F.2d at 898.

The district court first determined, under the guidelines of *McDonnell Douglas v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973) and *Smithers*, 629 F.2d at 895, that Duffy had established a prima facie showing of age discrimination. A plaintiff alleging a dis-

criminatory layoff need show only that he was laid off from a job for which he was qualified while others not in the protected class were treated more favorably. *Massarsky v. General Motors Corp.*, 706 F.2d 111, 118 (3d Cir.), *cert. denied*, —— U.S. ——, 104 S.Ct. 348, 78 L.Ed.2d 314 (1983).[3] *Wheeling-Pittsburgh* does not challenge the finding that Duffy established a prima facie case.

After a plaintiff has established a prima facie case of age discrimination, the burden shifts to the defendant to dispel the adverse inference by articulating "some legitimate, nondiscriminatory reason for the employee's rejection." *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981); *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 578, 98 S.Ct. 2943, 2950, 57 L.Ed.2d 957 (1978); *Massarsky*, 706 F.2d at 118; *Smithers*, 629 F.2d at 895. Once the defendant satisfies the requirement of articulating a non-discriminatory reason for the employee's discharge, the ultimate burden remains with the plaintiff to prove to the trier of fact that the defendant intentionally discriminated against the plaintiff. *Burdine*, 450 U.S. at 252–53, 101 S.Ct. at 1093–94; *Lewis*, 725 F.2d 910.

Wheeling-Pittsburgh argues that the district court made an error of law by

---

**2.** Prior to the May, 1980 discharges, the Philadelphia district consisted of the following six salesmen: in the Philadelphia office—Duffy (age 59, discharged), Sweeney (age 32, discharged), and McConegly (age 26, retained); in the Atlanta office—Mickle (age 53, discharged); in the Charlotte office—McCutcheon (age 61, discharged); and in the Richmond office—Walker (age 23, retained). In its reply brief and at oral argument, Wheeling-Pittsburgh argued that the court should have looked at the personnel decisions involving only the Philadelphia office, not the entire Philadelphia district. Wheeling-Pittsburgh, however, did not make this argument in the district court, and the district court accordingly framed its finding in terms of the entire Philadelphia district. We will not consider arguments raised for the first time before us. *E.g., Houghton v. American Guaranty Life Ins. Co.*, 692 F.2d 289, 294 (3d Cir.1982).

We note that even if we did consider the personnel changes in the Philadelphia office, Duffy would still have established a prima facie case,

by proof that he was discharged while McConegly, a younger employee, was retained.

**3.** Because Duffy's complaint concerned a reduction in force, it obviously was unnecessary for him to follow the literal terms of the *McDonnell Douglas* model and show that he was actually replaced by a younger employee. In *McDonnell Douglas*, the elements of the plaintiff's prima facie case were articulated in the context of an alleged discriminatory failure to hire. The Supreme Court made clear that the nature of the required showing depends on the circumstances of the case. *Massarsky*, 706 F.2d at 118; *see* 411 U.S. at 802 n. 13, 93 S.Ct. at 1824 n. 13; *see also* Teamsters v. United States, 431 U.S. 324, 358, 97 S.Ct. 1843, 1866, 52 L.Ed.2d 396 (1977); Williams v. General Motors Corp., 656 F.2d 120 (5th Cir.1981), *cert. denied*, 455 U.S. 943, 102 S.Ct. 1439, 71 L.Ed.2d 655 (1982); Jackson v. U.S. Steel Corp., 624 F.2d 436, 440 (3d Cir.1980) (Title VII case).

focusing on "pretext" and relieving Duffy from having to prove an actual discriminatory intent. However, under the *McDonnell Douglas* test, a showing that a proffered justification is pretextual is itself *equivalent* to a finding that the employer intentionally discriminated. As stated by the Court in *Burdine*, after the plaintiff has established a prima facie case and the defendant has articulated a nondiscriminatory reason for the challenged action, the plaintiff's burden of showing pretext "merges with the ultimate burden of persuading the Court that [the employee] has been the victim of discrimination. [The employee] may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." 450 U.S. at 256, 101 S.Ct. at 1095. *See also United States Postal Service Bd. of Governors v. Aikens*, 460 U.S. 711, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983); *Massarsky*, 706 F.2d at 118–19; *Behlar v. Smith*, 719 F.2d 950, 952 (8th Cir.1983).

Here, the district court properly applied the standards of *Burdine*. Contrary to the suggestion found in the dissent that a difference exists between the proofs required in an ADEA case and those required in a Title VII case (*see* Dissent, typescript at p. 9), the district court properly followed our established precedent. *See Smithers*, 629 F.2d at 892. It noted that "the fact that an employer can demonstrate that an employment decision was based upon sound business reasons will not preclude liability under the ADEA if the employee can prove, nevertheless, that (1) a discriminatory reason more likely motivated the employer or (2) the employer's proffered explanation is unworthy of credence." Thus, the district court applied proper legal precepts.

### III.

We next consider whether the district court's finding of pretext or intentional dis-

crimination was clearly erroneous. In the instant case, after Duffy established his prima facie case, Wheeling-Pittsburgh proffered a legitimate nondiscriminatory reason for Duffy's discharge that (1) economic conditions in the steel industry forced a cutback in personnel, and (2) Duffy was selected for termination based on relative job performance. The district court noted in its opinion that if Wheeling-Pittsburgh's explanation were true, it would adequately rebut any inference of discrimination.

▨ The district court, however, concluded that "defendant's articulated nondiscriminatory reason for the discharge of plaintiff's performance [sic] was pretextual. Accordingly, the Court finds that plaintiff was discharged on the basis of his age in violation of the ADEA." *Duffy v. Wheeling-Pittsburgh Steel Corp.*, Civ. No. 81–601, mem. op. at 12, (E.D.Pa. Sept. 30, 1983); App. at 359. We must defer to this finding unless it is "clearly erroneous." Fed.R.Civ.P. 52(a); *Pullman-Standard v. Swint*, 456 U.S. 273, 287, 102 S.Ct. 1781, 1789, 72 L.Ed.2d 66 (1982). We are satisfied that more than adequate evidence exists to support the district court's finding.

The district court found that "[o]f the five salesmen and one assistant sales manager in [Duffy's] district, [Wheeling-Pittsburgh] terminated the four oldest and most highly paid salesmen." *Duffy*, mem. op. at 7; App. at 365. They were paid "substantially higher salaries than the younger men retained, and the cost of their insurance, pensions and social security payments was greater." *Id.*

The district court also found that Duffy's performance "was superior to that of the younger men retained." *Duffy*, mem. op. at 6; App. at 364. This finding was based on the following evidence relating to the tonnage sold by each salesman employed by Wheeling-Pittsburgh at the time of Duffy's discharge.[4]

---

**4.** *See Duffy*, mem. op. at 6; App. at 364 (reference to employees not employed at time of Duffy's discharge omitted).

PHILADELPHIA DISTRICT
SHIPMENT BY SALES REPRESENTATIVE

| | Age | 1977 | 1978 | 1979 | 1980 |
|---|---|---|---|---|---|
| Office | | 16,192 | 17,468 | 22,410 | 47,413 |
| † Jack Mickle | 53 | 0 | 19,252 | 40,992 | 15,340 |
| Clyde Shelton | 46 | 9,955 | 17,536 | 16,867 | 45,692 |
| John McConegly | 26 | 0 | 0 | 75,458* | 36,672 |
| Rich Walker | 23 | 0 | 0 | 1,857 | 9,571 |
| † Lynn McCutcheon | 61 | 0 | 7,727 | 12,494 | 3,082 |
| † Doug Duffy | 59 | 25,819 | 51,602 | 52,575 | 17,899** |
| † Patrick Sweeney | 32 | 31,403 | 33,209 | 46,690 | 19,944 |

† Discharged

\* Duffy introduced uncontradicted testimony showing that this figure included a large, unique account which was credited to McConegly's record although the transactions occurred through the Pittsburgh office, without McConegly's participation. McConegly did not have that account in 1980, where the chart indicates that Duffy had a higher monthly sales average than McConegly.

\*\* Reflects half-year.

---

The district court also took note of a statement made in May of 1980 by Cornel Bolog, commercial vice-president of Wheeling-Pittsburgh, to William Shutt, age 59, who was discharged along with Duffy. According to Shutt's deposition, Bolog gave Shutt the following reasons for his discharge: "They were going to have to cut back in the Sales Department and were anxious to get younger and more aggressive people in the field." App. at 366.

Moreover, the district court also found that Wheeling-Pittsburgh's explanations and testimony were internally inconsistent and not credible. It is not our function to review the inconsistencies in the evidence and determine what testimony is to be credited. That function is one which is to be discharged, as the district court did here, by the trial judge. To argue, therefore, as does the dissent, that credit should have been given to witnesses from Wheeling-Pittsburgh when the district court explicit-ly declined to credit that testimony not only blurs the distinction that has been established between the district court and the appellate court provinces, but also would require in every instance our *de novo* review of the trial court's credibility determinations, even assuming that such review were feasible.

Bolog stated that the key factor in deciding which salesmen to terminate was performance and that each person being terminated was to be informed as to the cause of his termination. Wheeling-Pittsburgh originally claimed that Bolog, Frank McElhinney, general manager, and Clyde Shelton, Duffy's immediate supervisor, made the decisions on whom to fire. McElhinney's testimony, however, revealed that Shelton was not consulted about Duffy's performance, even though Shelton was the most qualified to assess Duffy's performance. The district court found that McElhinney did not request any input from Shelton, and

Shelton made no recommendation. Indeed, Shelton testified that Duffy's performance had not been evaluated since 1977, that neither McElhinney nor Bolog had reviewed any of Duffy's evaluations, and that the two younger salesmen retained in the Philadelphia district had never been evaluated before May of 1980.

Duffy himself testified that he was repeatedly informed that his discharge was due to economic reasons only. According to Duffy, this reason was provided by Nicholas Weldon, vice-president for personnel, who told Duffy that the discharge was unrelated to his performance. Based on the testimony of both Duffy and Clyde Shelton, Duffy's direct superior, the district court determined that only after Duffy filed his complaint did Wheeling-Pittsburgh for the first time assert that Duffy was selected for termination based on comparative performance.

As a whole, therefore, the evidence lends credence to the district court's inference that the alleged "poor performance" was a contrived story created by Wheeling-Pittsburgh after the fact. Because Wheeling-Pittsburgh's testimony and explanations were found not to be credible, they did not weigh against the evidence adduced by Duffy which supported the finding of pretext. Thus, the district court's finding of intentional discrimination cannot be held to be clearly erroneous. We therefore conclude that Duffy has carried his required burden.

### IV.

 Finally, Wheeling-Pittsburgh claims that the district court's order reinstating Duffy to his position was an abuse of discretion. Wheeling-Pittsburgh contends that reinstatement would create unreasonable hardship by forcing enlargement of the staff in the Philadelphia district. However, "[v]ictims of discrimination are entitled to be restored to the economic position they would have occupied but for the intervening unlawful conduct of employers. *Rodriguez v. Taylor*, 569 F.2d 1231, 1238 (3d Cir.1977), *cert. denied*, 436

U.S. 913, 98 S.Ct. 2254, 56 L.Ed.2d 414 (1978). The district court concluded that Duffy's reinstatement would not present unconscionable difficulties for Wheeling-Pittsburgh. Our review of the record supports that conclusion. We, therefore, find no abuse of discretion in the manner by which the district court fashioned a remedy to cure the act of discrimination for which it found Wheeling-Pittsburgh responsible.

### V.

The judgment of the district court dated September 30, 1983 will be affirmed.

ADAMS, Circuit Judge, dissenting.

It is a lamentable fact that when a failing company undertakes a reduction-in-force, loyal employees frequently lose their jobs because of economic forces wholly beyond their control. This is especially distressing when the laid-off employee is an older worker, who often encounters a particularly unreceptive employment market. Nonetheless, we cannot ignore the fact that the American steel industry, perhaps more than any other basic industry in this country, faces substantial threats to its survival. Alongside the sharply reduced demand of United States automakers for steel, competition from highly efficient producers in Japan, Western Europe and the developing countries has steadily increased. In these circumstances, American steel companies such as Wheeling-Pittsburgh (W–P) have been confronted with the painful task of eliminating the least productive elements of their operations, including, unfortunately, the least productive employees. Given the urgent national importance of this process of reorganizing the steel industry into a leaner, more efficient form, the courts should not—absent statutory or constitutional command—interfere with the difficult choices better suited to a business executive than to a federal judge.

To my mind, the majority today affirms a misapplication of the ADEA and thereby permits an unwarranted intrusion on the reorganization of an economically battered company. In analyzing Douglass Duffy's

discharge, the district court erred both by overlooking the critical distinctions between the ADEA and Title VII and by relying on evidence that does not support a finding of "pretext" at the third step of the test prescribed by *McDonnell Douglas v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). While I am deeply concerned about the difficulties faced by Duffy, as well as other similarly situated older workers in this country, I do not think that he has made out a case for relief under the ADEA. Accordingly, I respectfully dissent.

I.

The language of the ADEA makes it clear that Congress did not intend that the statute provide a general remedy for unemployment among older workers. Rather, Congress appears to have viewed the ADEA as aimed narrowly at the arbitrary use of age as a proxy for lack of ability. Thus the ADEA's statement of findings and purpose focuses on the problems of "arbitrary age limits regardless of potential for job performance" and the need "to promote employment of older persons based on their ability rather than age." 29 U.S.C. §§ 621(a), (b) (1982). Moreover, in the body of the statute, Congress specified that employers are not prohibited from making "differentiation ... based on reasonable factors other than age." 29 U.S.C. § 623(f)(1) (1982). By expressly incorporating a defense that is implicit in the statute anyway, and that was not included in the analogous provision of Title VII, *see* 42 U.S.C. § 2000e–2(e) (1982), Congress further highlighted its concern that older workers be evaluated objectively on the basis of their performance.[1] Apparently cognizant that the aging process can affect capability, Congress drafted the ADEA to distinguish carefully between those employment decisions that are arbitrary and those that are performance-related.[2]

The legislative history of the ADEA also demonstrates that Congress was aware of the substantial differences in the types of discrimination addressed by the ADEA and Title VII. In 1964, when drafting Title VII, Congress decided against including age as one of the categories of prohibited discrimination, and instead ordered the Secretary of Labor to undertake a study of age discrimination in employment. *See* 42 U.S.C. § 2000e–14 (1970). Completed in 1965, that study unambiguously concluded that there was "no evidence of prejudice based on dislike or intolerance for the older worker." U.S.Dept. of Labor, *Report to the Congress on Age Discrimination in Employment Under Section 715 of the Civil Rights Act of 1964* at 6 (1965). Congress was certainly aware of this conclusion during the debate on the ADEA, recognizing, in the words of one representative, that "age discrimination is not the same as the insidious discrimination based on race or creed prejudices and bigotry." 113 Cong.Rec. 34742 (1967) (Rep. Burke).[3] Rather than amend Title VII—a statute dealing with discrimination arising from bigotry—so as to incorporate a ban on age

---

1. In committee hearings, Secretary of Labor Wirtz emphasized the significance of this addition:

 It is made clear throughout the Bill, and identified specifically in Section 2(b) [29 U.S.C. § 621(b) (1982)] that the prohibition is of "discrimination" in the sense of *"arbitrary* age discrimination." This is reflected particularly in Section 4(b) [29 U.S.C. § 623(f) (1982)]. Age Discrimination in Employment: Hearings on Age Discrimination Bills Before the Subcomm. on Labor of the Senate Comm. on Labor and Public Welfare, 90th Cong., 1st Sess. 36, 39 (1967) (emphasis in original).

2. *See* Note, The Cost of Growing Old: Business Necessity and the ADEA, 88 Yale L.J. 565, 568 (1979); Note, The Age Discrimination in Employment Act of 1967, 90 Harv.L.Rev. 380, 380–81, 383–84 (1976). *See also Rodriguez v. Taylor*, 569 F.2d 1231, 1236–37 (3d Cir.1977) ("Age concededly differs from the Title VII classifications in that, for some jobs, statistically significant correlations might demonstrate that persons above certain middle ages are inherently disabled from performing as satisfactorily as their younger counterparts.")

3. *See also* 113 Cong.Rec. at 34752, 31254 (remarks of Rep. Dwyer and Sen. Javits); *Senate Hearings, supra* note 1, at 22.

discrimination,[4] Congress enacted a separate statute to deal with the problems created by misconceptions about the ability of older workers. This history suggests that Congress did not intend that the courts rely on the same strong suspicions of employer motives justified in Title VII litigation.[5]

## II.

ADEA's separate purpose and origins suggest that the *McDonnell Douglas* test should be tailored with the distinctive character of age discrimination in mind. The Supreme Court has declared that the *McDonnell Douglas* test "was not intended to be an inflexible rule," *Furnco Construction v. Waters,* 438 U.S. 567, 575, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978), or to be "rigid, mechanized or ritualistic. Rather, it is merely a sensible, orderly way to evaluate the evidence in light of common experience...." *Id.* at 577, 98 S.Ct. at 2949. Although the test has been developed by the Supreme Court in Title VII case law only, I believe it is appropriate, in view of the difficulty of proving age discrimination directly, to use this analytic framework in ADEA discriminatory treatment cases. But inasmuch as the ADEA and Title VII do not address identical problems, I believe it is a mistake to transpose, completely and uncritically, all the details of Title VII analysis into the area of age discrimination.

Underlying the *McDonnell Douglas* test is the presumption that unexplained actions by an employer are discriminatory. In the context of race discrimination, the *Furnco* Court explained that

> we are willing to presume this largely because we know from our experience that more often than not people do not act in a totally arbitrary manner, without any underlying reasons, especially in a business setting. Thus, when all legiti-

mate reasons for rejecting an applicant have been eliminated as possible reasons for the employer's actions, it is more likely than not the employer, who we generally assume acts only with *some* reason, based his decision on an impermissible consideration such as race.

438 U.S. at 577, 98 S.Ct. at 2950 (emphasis in original).

The *Furnco* presumption benefits a plaintiff at both the first and third steps of the *McDonnell Douglas* test. Assisted by the suspicion that accompanies unexplained employer actions, the plaintiff may establish a *prima facie* case simply by showing membership in the protected class, qualification for the job, and unfavorable treatment in comparison with someone outside the protected class. But once the employer comes forward with evidence that the discharge was motivated by a legitimate, nondiscriminatory reason, the plaintiff may respond with indirect proof of discrimination, aided again by the *Furnco* suspicion of employer motive. If the plaintiff successfully proves that the employer's explanation is not worthy of credence, the factfinder is permitted to infer that the nondiscriminatory reason for the discharge was in fact only a pretext for discrimination. *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 255–56, 101 S.Ct. 1089, 1094–95, 67 L.Ed.2d 207 (1981); *see also U.S. Postal Service Board v. Aikens,* 460 U.S. 711, 103 S.Ct. 1478, 1481, 75 L.Ed.2d 403 (1983).

Because this indirect method of proving discrimination rests squarely on the presumption of invidiousness explained in *Furnco,* a court should not—if it is to be consistent with the logic of the *McDonnell Douglas* test—evaluate a pretext claim in an ADEA case in exactly the same fashion as in a Title VII action. In examining

---

**4.** The idea of extending Title VII protection to older workers was unsuccessfully advocated both in 1967, *see* 1967 *Senate Hearings, supra* note 1, at 29, 35 (statements by Sens. Smather and Murphy), and again in 1974, when two such bills amending Title VII died in committee. *See, e.g.,* H.R. 16972, 93d Cong., 2d Sess. (1974), 120 Cong.Rec. H9782 (Oct. 1, 1974); H.R. 17383, 93d Cong., 2d Sess. (1974), 120 Cong.Rec. H10598 (Oct. 15, 1974).

**5.** *See generally* Note, Age Discrimination and the Disparate Impact Doctrine, 34 Stan.L.Rev. 837, 852–54 (1982); Note, *ADEA, supra* note 4, 90 Harv.L.Rev. at 381–84.

employment decisions affecting blacks or women, courts may logically suspect that even the decisions supported by reasonable factors other than race or sex may also have been tainted by hostility towards the protected class. An equally strong suspicion is not justified in an ADEA case. As the Supreme Court has noted, albeit in a constitutional case,

> [W]hile the treatment of the aged in this Nation has not been wholly free of discrimination, such persons, unlike, say, those who have been discriminated against on the basis of race or national origin, have not experienced a "history of purposeful unequal treatment" or been subjected to unique disabilities on the basis of stereotyped characteristics not truly indicative of their abilities.... [O]ld age does not define a "discrete and insular" group, in need of "extraordinary protection from the majoritarian political process." Instead, it marks a stage that each of us will reach if we live out our normal span.

*Mass.Bd. of Retirement v. Murgia,* 427 U.S. 307, 313–14, 96 S.Ct. 2562, 2567, 49 L.Ed.2d 520 (1976) (citations omitted). *See also Marshall v. Goodyear Tire & Rubber Co.* 554 F.2d 730, 736 (5th Cir.1977); *Laugesen v. Anaconda Co.,* 510 F.2d 307, 312 (6th Cir.1975).

The weaker presumption of bias in an age case does not undermine the usefulness of *McDonnell Douglas'* three-step allocation of the evidentiary burden. It does, however, suggest that proof of pretext at the third step of the analysis should be measured in light of the distinctive character of age discrimination. Thus I believe that when an employer shows that an ADEA claimant was selected for layoff because of performance, the claimant's rebuttal evidence of pretext should be evaluated with greater care than in a Title VII action.[6] Our intuitive understanding of bigotry supports an inference of pretext from virtually any defect in an employer's explanation of a decision to disfavor a member of a Title VII protected class. I do not think we should be as quick to infer pretext in an ADEA proceeding.

## III.

The district judge in this case provided a statement of the governing law that would have been completely proper in a Title VII suit. He clearly explained the indirect method of proof at the third step of *McDonnell Douglas* and correctly held that pretext may be inferred if the employee can prove that "the employer's proffered explanation is unworthy of credence." *Duffy v. Wheeling Pittsburgh Steel Corp.,* No. 81–0001, slip op. at 11 (E.D.Pa. Sept. 30, 1983). But in analyzing Duffy's pretext claim, the district court not only failed to acknowledge the differences between proof of pretext in the ADEA and Title VII settings, but in effect reversed the logic of these differences, and inferred pretext more readily than would be proper even in a Title VII action. Thus, in my view, the district court found pretext on the basis of evidence that would be inade-

---

**6.** Although our Court has applied *McDonnell Douglas* to ADEA claims, we have not had occasion to define the quantum or character of evidence necessary to prove pretext at the third step of the analysis. *See Massarsky v. General Motors Corp.,* 706 F.2d 111 (3d Cir.1983); *Smithers v. Bailar,* 629 F.2d 892 (3d Cir.1980). *Massarsky* is suggestive on this issue, pointing out that a finding of pretext

> would have been warranted had [the plaintiff] established that the Company's purported policy was merely a post-hoc rationalization or a policy that had been adopted specifically for the purpose of concealing discrimination on the basis of age.

706 F.2d at 119. *Massarsky's* ultimate holding, however, simply affirms a jury's determination that the plaintiff failed to rebut the employer's valid, nondiscriminatory explanation for its decision. The Court's other discussion of *McDonnell Douglas* in the ADEA context, *Smithers,* addresses only the ultimate burden of proof, *not* the intermediate burden at the third step of the analysis. *Smithers* makes clear that an ADEA plaintiff bears the ultimate burden of proving that "age was somehow determinative." 629 F.2d at 898. Thus, neither *Massarsky* nor *Smithers* reach the question whether proof of pretext in an ADEA case should be evaluated in the exact manner as such proof in a Title VII claim.

quate under any antidiscrimination statute, Title VII or otherwise.

### A.

To rebut Duffy's *prima facie* case, W–P came forward with evidence that for 25 years, Duffy had been no more than an adequate salesman. Duffy's performance did not affect his job status until the deterioration of the steel market forced a drastic streamlining of operations.

When he was discharged in May 1980, Duffy was a "line salesman," the same position he had held since beginning with W–P in 1955. He had received only three "merit increases" in pay during his 25-year tenure, the last of which was awarded in 1970. During the last four years when salesmen in the Philadelphia District received written evaluations (1974–77), *see* App. at 308, Duffy was reported to be "well liked" by his customers and coworkers, but lacking in "follow up," "creative effort," "self start[ing]," "aggressive[ness]," "planning," "initiative," "in depth selling," "territory coverage," and "volume of work." *See* App. at 340–347. Described as "complacent" and criticized for the "few accounts [he] handled," App. at 344, Duffy was rated in every report as having no potential for advancement. *See* App. at 340–47. Duffy's immediate supervisor testified that Duffy's job performance showed no substantial change through 1980 and that the reports accurately describe Duffy's work. *See* App. at 291, 206–11.

Nonetheless, the district judge determined that W–P's explanation for discharging Duffy was "unworthy of belief and a mere pretext." Slip op. at 12. To support his finding of pretext, the judge looked to two types of evidence: (1) a chart indicating the tons of steel sales per year attributable to each salesman which proved, according to the court, that Duffy's performance was—"by objective criteria"—"superior to that of the younger men retained," *id.* at 6, 13; and (2) "inconsisten[t]" and "not credible" testimony by various W–P executives which, according to the court, demonstrated that W–P management did not in fact believe that Duffy's performance was inferior. *Id.* at 12–13. I believe that the district judge's evaluation of this evidence reflects a basic misunderstanding of proof of pretext in a discriminatory treatment case.

### B.

Insofar as an independent evaluation of a worker's performance is necessary in order to discover an employer's motive for a layoff, courts should not assume that objective evidence of performance reveals self-evident conclusions. It is essential that the proponent of performance evidence provide some basis for measuring the business significance of that data.

Contrary to this teaching, the district judge in this case attempted to evaluate the "objective criteria" of Duffy's performance exclusively on the basis of his independent and somewhat perplexing interpretation of a chart showing the tons of steel sold by each salesman in the Philadelphia District.[7]

7. The tonnage sales chart provides scant support for the district judge's finding that Duffy was a "superior" sales man. During 1979–80, the three line salesmen working out of the Philadelphia office were credited as follows:

| | 1979 | 1980 |
|---|---|---|
| Duffy (age 59, discharged) | 52,575 | 17,889* |
| Sweeney (age 32, discharged) | 46,690 | 19,944* |
| McConegly (age 26, retained) | 75,458 | 36,672 |

\* Reflects ½ year.

If the chart shows anything—and I have considerable doubt whether it does—it suggests that W–P correctly chose to retain only McConegly in the Philadelphia office.

Contrary to the majority's suggestion, the district judge did not attempt to explain his interpretation of the chart by noting that in 1979, McConegly's sales "included a large, unique account which was credited to McConegly's record although the transactions occurred through the Pittsburgh office, without McConegly's participation," and that in 1980, "Duffy had a higher monthly sales average than McConegly." *See* Maj. Op. at 1397. This explanation for discounting the apparent significance of McConegly's tonnage sales was suggested in Duffy's proposed findings of fact, *see* App. at 356, 388–89 (Pro-

Despite the data's considerable ambiguity, the judge apparently evaluated the chart without the assistance of any record testimony indicating its business significance.[8] Absent such explanatory testimony, reliance on the chart was misplaced.

### C.

Aside from the sales chart, the only other evidence cited by the district judge to support his finding of pretext was testimony he viewed as "inconsisten[t]" and "not credible." Slip op. at 12. While inconsistent and incredible testimony is relevant in a discriminatory treatment case, not every discernible variance in testimony by the executives of an employer is probative of pretext. In this case, the evidentiary defects cited by the district judge were, as a matter of law, not relevant to Duffy's pretext claim.[9]

The one item of incredible testimony cited by the district judge was W–P's explanation for its failure to consult Duffy's immediate supervisor, the district sales manager for the Philadelphia District, prior to selecting Duffy for the layoff. The judge found it "not credible" that W–P "did not want to put [the district sales manager] in the difficult position of trying to protect his district or his employee friends." Slip op. at 12. This evidence would be significant if it suggested that Duffy had been chosen for layoff by a different procedure than that used for the young employees discharged. Here, however, the judge failed to mention the uncontradicted evidence that *no* district sales managers were consulted during the May 1980 layoff. App. at 240–42.

Most of the "inconsistencies" relied on by the district judge were found in evidence that neither Duffy nor his supervisor were told that "performance" was the reason for the discharges, even though W–P management intended that this be explained to all discharged employees. Slip op. at 11–12. Such evidence surely suggests an effort, perhaps an unduly solicitous one, to avoid adding insult to injury in Duffy's discharge. Perhaps it also evinces the sort of bureaucratic sloppiness one would expect in a hastily-implemented excision of 15 percent of a huge organization. However, absent some evidence suggesting that Duffy's discharge was handled differently from that of the younger salesmen who were also discharged, W–P's organizational "glitches" are not probative of pretext for age discrimination.

A final inconsistency relied on by the district judge was the fact that Frank McElhinney, one of the three general managers responsible for selecting Duffy for the layoff, "could not recall what [Duffy's] performance was in the 9 month period" before his discharge. *Id.* op. at 12. The court ignored, however, the fact that McElhinney could not recall many details of the decision to fire employees both older and younger than Duffy, *see* App. at 258–80, a fact that is not surprising in view of McElhinney's position as general manager of W–P's entire Eastern Division, App. at 133–34, which included the huge Philadelphia District as only one of its sales regions. App. at 234.

Nowhere in the district court's opinion or in the record is there any evidence suggesting that the negative evaluations of Duffy

---

posed Finding # 17), but never accepted by the district court. Whatever the proper interpretation of this chart, I believe that the ambiguity in McConegly's data demonstrates the inherent unreliability of this chart in its current, unexplained form.

**8.** For example, the chart does not show how many new accounts were developed each year. Nor does it give any indication of the number of long-established, major accounts contributing to each salesman's total. Finally, the chart provides no information on whether a salesman working out of the Atlanta, Charlotte, or Rich-

mond offices of the far-flung Philadelphia District could be expected to sell as much as salesmen like Duffy who were working in Philadelphia proper.

**9.** Thus it is not suggested that there should be a *de novo* review of the district court's credibility determinations. That task, as the majority observes, is delegated to the trial judge. Rather, my concern is purely legal—that is, what types of evidence are legally sufficient to show pretext.

should not be trusted. Nowhere is there any evidence suggesting that W–P management did not in fact believe that Duffy was only a minimally adequate salesman. To support a finding of pretext, Duffy should have been required to come forward with more than evidence of careless communications and forgetfulness.

### D.

As additional support for the finding of pretext, the majority stresses that W–P discharged the four oldest and most highly paid salesmen in the Philadelphia District. *See* Maj.Op. at 1395, 1397.[10] To infer pretext from this evidence of impact, however, is to assume that an unbiased evaluation of performance will never produce effects that correlate with age. The majority's reliance on this unsubstantiated assumption seems particularly improvident in the present case, since the district judge did not rely on the impact evidence in his analysis of the pretext issue. *See Duffy, supra,* slip op. at 12–13. Indeed, the district judge expressly precluded Duffy from presenting statistical testimony on the impact data in part because:

> The expert's report presupposes equality of all factors other than age. As the testimony revealed, however, all other factors, particularly job performance, were not equal. Thus, the analysis is not probative.

App. at 357–58 (citations omitted). To be sure, a proper statistical analysis of the impact evidence could be very helpful on the issue of pretext.[11] But in its present form, without any effort to determine the age-distribution that would be expected from a bias-free decision, the impact evidence is devoid of probative value.

---

**10.** The discharged salesmen were Patrick Sweeney (age 32), Jack Mickle (age 53), Doug Duffy (age 59), and Lynn McCutcheon (age 61).

**11.** In *Elliott v. Group Medical & Surgical Service,* 714 F.2d 556 (5th Cir.1983), *cert. denied,* ——— U.S. ———, 104 S.Ct. 2658, 81 L.Ed.2d 364 (1984), ADEA plaintiffs showed that they were

### IV.

There can be no doubt that the entire steel industry, and W–P in particular, faced a crisis in May 1980. The pivotal question in this case is whether, despite his lacklustre record as a salesman, Duffy was included because of his age in the 15 percent laid off by W–P. As I see it, Duffy's evidence purporting to show pretext is, without some additional information, lacking in probative force. In reaching the opposite conclusion, the district judge not only omitted the more careful scrutiny of Duffy's pretext evidence that is required in an ADEA lawsuit, but in fact found pretext from a record that would be insufficient even under Title VII. Because I believe that Duffy failed to prove that W–P's claim of poor performance was a pretext for age discrimination, I respectfully dissent.

---

all over forty, that they were all terminated, and that all but one of them were replaced by men under forty. Yet when this impact evidence was subjected to statistical analysis, the expert concluded that "age could neither be ruled in nor ruled out statistically as the factor leading to the discharges." 714 F.2d at 565.