Harold F. CURTIS

v.

ROBERN, INC.

Civ. A. No. 92–6535.

United States District Court,
E.D. Pennsylvania.

April 28, 1993.

As Corrected April 29, 1993.

Elliot B. Platt, Philadelphia, PA, for plaintiff.

Richard S. Meyer, Blank, Rome, Comisky & McCauley, Philadelphia, PA, for defendants.

## MEMORANDUM

DALZELL, District Judge.

Defendant Robern, Inc. is a manufacturer and distributor of architectural quality building supplies. As was the case with many firms in the building industry, Robern's fortunes suffered in the recent recession.

In response to the recession, Robern laid off a number of its employees. Plaintiff Harold Curtis was one of them. The issue in this case is whether Curtis was a victim of the recession or of age discrimination, in violation of the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621 *et seq.*

We held a non-jury trial on April 21 and 22, and the following will constitute our findings of fact and conclusions of law in accordance with Fed.R.Civ.P. 52(a). We have federal question jurisdiction under 28 U.S.C. § 1331.

### Background

The parties have stipulated to many of the underlying facts. Although Robern is now a manufacturer of aluminum railings and medicine cabinets, until around August of 1991 it was also a distributor of pre-manufactured building materials for installation in new homes. Such products included shower

doors, closet doors, towel bars, and other bathroom accessories.

At all times relevant to this action, Robern employed more than twenty people and was engaged in interstate commerce. More specifically, as of February, 1990, Robern had fifty-five employees.

In August of 1977, Robern hired Curtis as a warehouseman. At the time, Curtis was 47 years old (his date of birth is January 19, 1930). Curtis's title was changed to "Leadman" in 1987. According to Mark R. Madeira, Robern's General Manager, "Leadman" is a designation given to employees Robern considered "very knowledgeable" about their jobs.

Robern hired Jesse Walsh in 1985 as a warehouseman. At the time he was hired, Walsh was 21 years old (his date of birth is May 19, 1964). Thus, from 1985 through 1991, both Jesse Walsh and Harold Curtis worked full-time in the approximately 6,000 square foot inventory section of the 32,000 square foot plant in Bensalem, Pennsylvania.

The parties have stipulated that beginning in early 1990, the recession in the building and new construction industry began to take its toll on Robern's business. Consequently, a reduction in force commenced in March of 1990, and by a year later, nineteen employees were laid off and not replaced.

General Manager Mark Madeira, who was 26 years old at the time (his date of birth is August 4, 1964), decided that the warehouse did not require two full-time employees, and thus either Jesse Walsh or Harold Curtis would have to be laid off. The parties have stipulated that Madeira and Larry Katz, then the Materials Manager, made the final decision that resulted, on February 15, 1991, in Curtis's layoff.

No one at trial disputed Curtis's testimony that on February 15, at about 2:30 in the afternoon, Larry Perpente, then Robern's Traffic Manager, called Curtis into the office of Michael Seville and told Curtis, "We are going to have to let you go today." Curtis therefore that day ended almost fourteen years of service to Robern with no advance warning. Jesse Walsh, 34 years' Curtis's junior, kept his job.

*Factual and Legal Analysis*

■ In closing argument, Robern's counsel conceded that Curtis established a *prima facie* case under the ADEA. In short, there is no dispute that Curtis belongs to a protected class,[1] was qualified for the job, was laid off despite his qualification, in favor of an individual sufficiently younger to permit an inference of age discrimination. *Gray v. York Newspapers, Inc.,* 957 F.2d 1070, 1078 (3d Cir.1992).

Having established a *prima facie* case, the burden of production shifts to Robern to demonstrate a legitimate, non-discriminatory reason for the discharge. *Gray,* 957 F.2d at 1078. Robern has produced evidence of such a reason. Thus, for Curtis to prevail, we must find, by a preponderance of the evidence, that Robern's articulated reason is a pretext for discrimination. *Billet v. Cigna Corp.,* 940 F.2d 812, 816 (3d Cir.1991). On examining the record as a whole, Curtis has carried his burden of establishing pretext. Put in the vocabulary of applicable authority, we find, for the reasons stated below, that Robern's explanation of its decision to lay off a 61 year old well-qualified employee in favor of a 26 year old employee to be "unworthy of credence." *Hazen Paper Co. v. Biggins,* —— U.S. ——, ——, 113 S.Ct. 1701, 1708, 123 L.Ed.2d 338, (1993), quoting *United States Postal Service Bd. of Governors v. Aikens,* 460 U.S. 711, 716, 103 S.Ct. 1478, 1482, 75 L.Ed.2d 403 (1983) and *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 256, 101 S.Ct. 1089, 1095, 67 L.Ed.2d 207 (1981).

Robern's version at trial of why it laid off Curtis instead of Walsh was that Walsh was adept at operating Robern's computer-based inventory control system and had more experience dealing with "paperwork" than Curtis. This "paperwork" was merely filling out bills of lading, entering United Parcel Service shipments in a "UPS log", and managing

---

1. 29 U.S.C. § 631(a) limits the protections of the ADEA "to individuals who are at least 40 years of age."

equally rudimentary documents. It was never disputed that Curtis could, in fact, use the computer, and, in fact, did so. Robern's explanation at trial was, however, that Walsh was at ease with the computer and "paperwork" because he dealt with both on a daily basis and Curtis did not.

As the parties stipulated, Larry Katz, the Materials Manager, joined with Mark Madeira in making the decision to lay off Curtis. Katz's version of the reason for the layoff had nothing to do with computer or "paperwork" skills, and had everything to do with "economics". Katz stated that the "overwhelming reason" for Curtis's layoff "was money," *i.e.*, Curtis made more than Walsh. Katz's superior, Madeira, contradicted Katz, and stated that the "cost difference between the two was negligible."

Although not a participant in the final decision to lay off Curtis in favor of Walsh, Larry Perpente, the former Traffic Manager, offered a third explanation. Perpente testified that the reason he believed Curtis was selected for layoff was because the "builder end" of the business, with which Curtis was familiar, was being phased out, and Walsh knew the growing "cabinet end", in Perpente's words, "inside and out." Madeira rejected this explanation for the decision he and Katz made.

It is quite apparent that much of the parties' dispute over whether cost was a motivating factor was because both sides were acutely aware of the Seventh Circuit's decision in *Metz v. Transit Mix, Inc.*, 828 F.2d 1202 (7th Cir.1987), which held that firing of an older employee to save salary costs resulting from seniority was a violation of the ADEA. Last week, however, the Supreme Court specifically disapproved the Seventh Circuit's decision in *Metz* when it decided *Hazen Paper, supra.*

Given that the testimony of Madeira and Katz were almost certainly shaped by concern for *Metz*, we believe that, to borrow a word Katz used in his telephone discussion with a representative of the United States Equal Employment Opportunity Commission, this subject was a "smokescreen." During the recross-examination, Katz acknowledged that he did not mention "money" in an exculpatory document he prepared in April, 1991, for Madeira because he "felt it would have been detrimental ... a detrimental statement." When Robern's counsel asked Katz what would have been "detrimental" about a reference to Curtis's compensation, Katz, acknowledging that he was not legally trained, said that the money differential "sounds discriminatory."

Given that a 26 year old General Manager and a 36 year old Materials Manager made the decision to lay off a 61 year old warehouse employee in favor of a 26 year old employee, we simply cannot conclude that both Katz and Madeira were ignorant of the age differential between Curtis and Walsh, or of the legal consequences of their February, 1991, decision. If we had any serious doubt on this subject, it would be removed by considering Madeira's behavior when he received a March 29, 1991 "Notice of Charge of Discrimination" from the EEOC's investigator, Deborah Bush (P–7).

The March 29 EEOC notice specifically stated that "No action is required on your part at this time." Notwithstanding this fact, Madeira testified that he caused Katz to draft a statement, which was dated "4–1–91", regarding Curtis's layoff.[2] In his deposition, and in the early part of his testimony at trial, Madeira claimed that he received Katz's handwritten statement (P–9) "a day or two" after receiving the EEOC notice. Later in the trial, however, we brought to Madeira's attention that March 29, 1991 was a Friday and April 1, a Monday. There is no dispute that Madeira was not in the office over the intervening weekend. In order to reconcile the date ascribed to P–9 with the immutable constraints of the calendar, Madeira then amended his testimony to say that Katz "must have" returned the statement on the day Robern received the EEOC notice. We find Madeira's testimony on this point not only incredible, but also as strong evidence of Madeira's urgent desire to improve the ap-

2. Katz admitted in his testimony that he drafted this statement in an effort to be helpful to his then-employer. Katz was later himself laid off.

pearance of what he knew to have been an unlawful act on February 15, 1991.

First, it will be recalled that the March 29 EEOC notice by its terms called for "no action", and thus there was no urgency to do anything at all. Second, although Madeira, a Pennsylvania notary, certified on P–9 that on April 1, 1991 Katz had "sworn and subscribed" before him, Madeira admitted at trial that nothing of the kind happened, and that he merely attested Katz's signature after Katz had handed him the document. We can only conclude that Madeira's haste to make a record, and his certification contrary to his duties as a notary, are strong evidence of his knowledge of the wrongfulness of what he had authorized in February. It also, of course, demonstrates that his testimony on Robern's behalf is unworthy of belief.[3]

Madeira had to admit that Curtis's layoff was not in conformity with the company's own procedures. Robern issues to every employee a handbook of policies (P–6) so detailed that it describes in fourteen lines of small print the minutiae of rules governing personal telephone calls. The last section of the handbook deals with "layoffs". For employees working in the same "work areas" as Curtis and Walsh were, the handbook states that:

> ... seniority shall be followed, provided that the remaining employees have the necessary skills and ability to perform the work.... Management will attempt to notify employees three work days in advance of layoffs, if possible.

P–6 at 14.

Although Robern attempted, largely through Madeira's testimony, to suggest that Walsh had "the necessary skills and ability to perform the work" and Curtis did not, by the time of closing argument, Robern's counsel readily agreed that Curtis had at least the ability to do it. Robern's internal documentary record, however, suggests that it regarded Curtis's "skills and ability" more highly than Walsh's.

All employees of Robern undergo annual reviews, and these reviews are recorded on a form called an "Employee Rate Review Sheet". These review sheets are the predicate for deciding whether the employee should get a raise and, if so, how much.

Curtis's last formal review occurred on September 28, 1990 (P–5). His overall performance was rated in the highest category, "more than adequate". The form defines "job knowledge" as "understands job methods and procedures, measure of skill & ablty [*sic*]." Perpente on September 28, 1990, rated Curtis "R" in "job knowledge". This rating is the highest of five that can be made, and the form says it should be awarded to "one who demonstrates rare excellence compared to others who are proficient."

By contrast, Walsh's "Employee Rate Review Sheet" documented, in its August 21, 1990 version (Court Exhibit 1), that Walsh's "total performance" was "adequate" and not, like Curtis's, "more than adequate". Under "job knowledge", said to be the whole reason for choosing the 26 year old instead of the 61 year old, Walsh's August 21, 1990 form rated him "M", one level below Curtis's "R". Perpente was also Walsh's reviewer.

By its own documentation prepared *ante litem motam*, Robern rated Curtis as materially more valuable to the company than Walsh.

Although Madeira without evident embarrassment testified that it would take "several weeks" for Curtis to learn the computer and

---

**3.** There is a plausible, and perhaps more likely, alternative explanation of this document. On April 17, 1991, the EEOC's Mrs. Bush sent a five-page questionnaire to Madeira that called for a response "on or before May 7, 1991" (P–8). When he responded on April 30, 1991, Madeira made Katz's "4–1–91" statement the first attachment to Robern's submission to the EEOC.

Madeira testified that people at Robern "never" backdate documents, and yet he also testified that the owner of the business specifically told him *not* to backdate Katz's statement. This account invites us into the realm of Dada, which we decline. A far less nonsensical interpretation of events is that the "4–1–91" statement was in fact created after Madeira received the April 17 questionnaire.

This more plausible interpretation only confirms the more charitable one, set forth in the text, that Madeira was anxious to create documentation of non-age-based reasons for his layoff of Curtis, and did so unhindered by concern for the truth.

"paperwork" to Walsh's level of proficiency, Katz stated, and we credit his testimony, that it would take as little as fifteen minutes or, at the most, two days to become as adept in all respects as Walsh in the daily use of the computer and management of the paper flow.[4] Such a minuscule difference[5] could scarcely outweigh the difference in proficiency that the company identified in the job evaluations of September 28 and August 21 the year before. This difference was, however, palpably a "smokescreen" for Madeira to attempt to dress up what had happened to conform with the company's policies set forth in the Employee Handbook and thereby to attempt to negate the fact that "age made a difference"[6] in the decision to lay off Curtis instead of Walsh.

Ironically enough, Walsh was himself terminated on July 24, 1992, and replaced by Rohan Shiwdarsan, who, at the time, was 28 (his date of birth is August 3, 1963). Notably, Mr. Shiwdarsan had *no* experience (1) working in the warehouse, (2) with the inventory control computer, or (3) with the warehouse "paperwork". Madeira testified that Shiwdarsan was chosen because there was no one present with any knowledge of the job, and Shiwdarsan at least knew the components of cabinets because he had built them. When asked on cross-examination why Robern did not call back Curtis, Madeira referred to a "policy" that laid off employees are only recalled if the recall occurs within six months of termination. No such "policy" is mentioned in the Employee Handbook, and Robern proffered no document from any other source to confirm the existence of such a "policy". We can only infer, therefore, that no such "policy" exists, and that Curtis was not called back for the same reason he was laid off, his age.

Recognizing that Madeira's handling of Curtis's layoff and its aftermath did not present a textbook case of deft personnel management, Robern's counsel sought, in his closing argument, to explain away Madeira's at best heavy-handed conduct, noting that Robern's General Manager was "not as mature as you or I or the rest of us", that Madeira was, at the relevant times, "[a] 25 or 26 or 27–year–old kid."[7] In truth, Madeira was the company's *Wunderkind*, entrusted with complete operational authority over this substantial business at 25.[8] While Madeira is doubtless a highly intelligent, aggressive young man, his peremptory handling of Curtis's termination—not even affording the three days' notice promised in the Employee Handbook—demonstrates his insensitivity to good employee relations. His admitted misuse of the *jurat* demonstrates his insensitivity to his official office, as well as to the truth. His choice of a warehouseman his own age, rather than one 35 years his senior, and one who had served the company with distinction for almost fourteen years, makes us conclude that any motive other than age discrimination is simply "unworthy of credence". We therefore find that age was a determinative factor in Robern's decisions to lay off Curtis and not to recall him when Walsh was fired.

*"Willfulness"*

■ Having found that Curtis's age was indeed a determinative factor in Robern's action of February 15, 1991 and inaction in July of 1992, we must also determine whether that conduct was "willful" within the meaning of § 7(b) of the ADEA, 29 U.S.C. § 626(b), in order to determine whether the violation gives rise to liquidated damages.

---

4. Katz was in a much better position, as Curtis's sometime supervisor, to estimate the time necessary to learn these tasks than Madeira, who never supervised Curtis or Walsh and only walked through the vast plant a few minutes each day.

5. Robern argues in its Post–Trial Brief, at p. 3, n. 4, that any "additional training" necessary for Curtis would amount to "preferential treatment" that the ADEA does not require. The "additional training" Katz identified is so trivial that it does not begin to outweigh the recognized experience

that this "more than adequate" employee brought to the job.

6. *Duffy v. Wheeling Pittsburgh Steel Corp.*, 738 F.2d 1393, 1395 (3d Cir.), *cert. denied*, 469 U.S. 1087, 105 S.Ct. 592, 83 L.Ed.2d 702 (1984).

7. Transcript of April 22, 1993, closing argument at 40, 39.

8. He was only 21 or 22 when he was hired as the company's Controller.

Although it had been the rule in this Circuit that "willfulness" could only be found when the employer's conduct was "outrageous", *Lockhart v. Westinghouse Credit Corp.*, 879 F.2d 43, 57–58 (3d Cir.1989), the Supreme Court specifically disapproved of that standard in the *Hazen Paper* decision last week, *supra*, — U.S. —, 113 S.Ct. at 1708–1709. In rejecting *Lockhart*, the Supreme Court in *Hazen Paper* reaffirmed its definition of "willful" in *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 126, 105 S.Ct. 613, 624, 83 L.Ed.2d 523 (1985) and *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133, 108 S.Ct. 1677, 1681, 100 L.Ed.2d 115 (1988). The Court in *Hazen Paper* held that "willful" under § 7(b)

> "... is generally understood to refer to conduct that is not merely negligent. The standard of willfulness that was adopted in *Thurston*—that the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute—is surely a fair reading of the plain language of the Act."

*Id.* at —, 113 S.Ct. at 1708, quoting *Richland Shoe*, *supra*, 486 U.S. at 133, 108 S.Ct. at 1681.

To avoid a finding of "willfulness", the Supreme Court in *Hazen Paper* stated that an employer must show it "incorrectly but in good faith and nonrecklessly believes that the statute permits a particular age-based decision," and if it does so "liquidated damages should not be imposed." *Hazen Paper* at —, 113 S.Ct. at 1709.

We see no basis, on this record, to find that Robern "in good faith and nonrecklessly" believed that the ADEA permitted its age-based decision against Curtis. Robern's failure to follow the standard it created for itself in the "layoffs" section of the Employee Handbook alone would preclude a finding of such good faith.[9] Further, Madeira's urgency in creating the "4–1–91" statement, and the evident shaping of the documentary and later evidentiary record to conform with *Metz*, would support an affirmative finding of Robern's bad faith. Under *Hazen Paper*, however, we need not go so far, and merely hold that Robern did not act in good faith and nonrecklessly when it laid off Curtis. Consequently, Curtis is entitled to liquidated damages equal to his back pay loss during the period February 16, 1991 through April 30, 1993.

*Reinstatement*

■ Curtis has also asked for an award of front pay, that is to say, an award for future earnings, because he believes that the atmosphere at Robern would be hostile to him if reinstatement were ordered.

■ As Chief Judge Sloviter has held for our Court of Appeals, however, "[r]einstatement is the preferred remedy to avoid future lost earnings," although she also recognized, for the panel, that "reinstatement may not be feasible in all cases." *Maxfield v. Sinclair International*, 766 F.2d 788, 796 (3d Cir. 1985), *cert. denied* 474 U.S. 1057, 106 S.Ct. 796, 88 L.Ed.2d 773 (1986).[10] We should only avoid the "preferred remedy" of reinstatement if there is "no position available at the time of judgment or the relationship between the parties may have been so damaged by animosity that reinstatement is impracticable." *Id.*, citing *Whittlesey v. Union Carbide Corp.*, 742 F.2d 724, 728 (2d Cir.1984); *Cancellier v. Federated Department Stores*, 672 F.2d 1312, 1319 (9th Cir.), *cert. denied*, 459 U.S. 859, 103 S.Ct. 131, 74 L.Ed.2d 113 (1982).

Nothing adduced before us at trial leads us to conclude that reinstatement is not "feasible" here. The only basis cited against the feasibility of reinstatement was Curtis's concern about "hostility".

Obviously, there will inevitably be some measure of bad feelings after every employment discrimination case is concluded, and

---

9. Robern was well aware of its responsibilities under the ADEA. The Employee Handbook on its second page explicitly recognizes Robern's duties under "applicable laws and regulations governing equal employment and non-discrimination in employment on the basis of ... age...."

10. Congress specifically included the power to order reinstatement within the scope of "legal or equitable relief" a court may grant. 29 U.S.C. § 626(b).

thus the evidence of such feelings cannot preclude reinstatement, the "preferred remedy" in these cases. Further, Curtis admitted on cross-examination that no one from Robern has in fact expressed *any* hostility toward him since February 15, 1991.

We are also impressed by the demeanor of Bernard Meyers, Robern's President and owner, which in no way demonstrated any rancor toward Curtis. Indeed, based upon his conduct during the trial of this case, we are convinced that Bernard Meyers will heed the lesson Congress has taught in the ADEA and not allow any retaliation against Curtis because of Curtis's assertion of his rights under that statute.

We also take note of the fact that Katz, Perpente and, most important of all, Walsh are no longer employees at Robern. Madeira does not work in the plant, and only spends at most a few minutes each day walking through the 32,000 square foot facility. There is no reason to expect, therefore, that Messrs. Curtis and Madeira need have much to do with one another in the course of their duties on behalf of the business.

We shall, therefore, order reinstatement, effective May 1, 1993.

*Pennsylvania Human Relations Act Damages*

■ Since we have found that Robern violated the ADEA in its layoff of Curtis and later failure to recall him, we also have no difficulty finding that it also engaged in an "unlawful discriminatory practice" within the meaning of § 11(c) of the Pennsylvania Human Relations Act, 43 Pa.Stat.Ann. § 962(c) (1991). This statute gives courts authority to impose "any other legal or equitable relief as" we deem "appropriate", and the Pennsylvania Supreme Court has authorized the imposition of damages for humiliation and mental anguish as part of such "legal or equitable relief". *Pennsylvania Human Relations Commission v. Zamantakis*, 478 Pa. 454, 387 A.2d 70, 73 (1978).

■ For several months after February 15, 1991, Curtis had no full-time employment. We find his testimony entirely credible that he was humiliated and embarrassed by this sudden termination after fourteen years' loyal and good work at Robern. We also have no difficulty accepting his testimony of sleepless nights because of his fear that at age 61 he would not be able to find full-time employment. Indeed, he mailed twenty resumes to prospective employers without a single response. Fortunately, Curtis commenced full-time employment on November 11, 1991 as a warehouseman at New Jersey Mirror & Bath Accessories in Lakewood, New Jersey.

Valuing Curtis's mental anguish during these months of unemployment is, obviously, an imponderable, although given its unquestioned reality, it clearly deserves compensation. We will therefore award $15,000 for this suffering incurred as a result of Robern's unlawful and discriminatory conduct.

*Back Pay Damages*

■ In accordance with the ADEA, we calculate back pay with the object of "making persons whole for injuries suffered through past discrimination." *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 421, 95 S.Ct. 2362, 2373, 45 L.Ed.2d 280 (1975). As Chief Judge Sloviter noted in *Maxfield, supra*, "courts have held that the ADEA does require mitigation of damages and have consistently deducted interim earnings from backpay awards." *Maxfield, supra*, 766 F.2d at 794 n. 5. We therefore must measure what Curtis would have earned had he not been laid off, including his benefits, less the sums he earned from full-time employment in mitigation of his layoff. Here, given Curtis's consistent high evaluations, and Madeira's testimony that the maximum hourly rate annual increase was $.66, we will assume that his $9.85 per hour compensation would have increased on his anniversary date of September 4, 1991 to $10.51, and on September 5, 1992 to $11.17 per hour. Assuming that he continued to work forty hours per week, he would have earned the following at Robern:

2/16/91–9/3/91 = 28 weeks = 1,120 hrs. × $ 9.85/hr. = $11,032.00
9/4/91–9/4/92 = 52 weeks = 2,080 hrs. × $10.51/hr. = $21,860.80
9/5/92–4/30/93 = 34 weeks = 1,360 hrs. × $11.17/hr. = $15,191.20
$48,084.00

Madeira testified that employees received a 3% bonus on their base salary, and so Curtis would have earned a bonus of $1,442.50 on that base compensation. The total gross back pay would, therefore, be $49,526.50.

■ Curtis asks us to add additional compensation for overtime he says he would have worked. While it is true he earned overtime compensation in prior years, the very predicate of the layoff was a significant slowdown in business. Under these circumstances, we believe that the question of whether Curtis would have earned any overtime is entirely too speculative to impose additional damages for such hypothesized work.

■ On the other hand, the employee health benefits at Robern were considerably more liberal than at New Jersey Mirror, where they have been non-existent. From March 1, 1991 through April 30, 1993, Curtis paid $3,658.60 in health insurance premiums that he would not have paid had he remained in Robern's employ. He also would not have had to pay most of the $478.56 he paid for prescriptions. On the other hand, since there was a co-pay provision for prescriptions at Robern, we have deducted $50.00 from the $478.56 as representing what he would have paid for his prescriptions had he remained at Robern. Thus, the total benefits lost were $4,087.16.

Taken together, the gross compensation Curtis would have received from Robern from February 16, 1991 through April 30, 1993 was $53,613.66.

During this same period of time, Curtis earned $30,980.00 from New Jersey Mirror, or $22,633.66 less than he would have made had he not been unlawfully laid off. To these damages we will add $22,633.66 as liquidated damages given our finding of willfulness, to which we will also add Curtis's PHRA dam-

ages of $15,000.00, for a total judgment of $60,267.32.

*Attorney's Fees*

■ As the prevailing party, Curtis is entitled to "a reasonable attorney's fee" and his "costs of the action" in connection with the prosecution of his meritorious claim. 29 U.S.C. § 626(b), incorporating by reference 29 U.S.C. § 216(b). His counsel has filed an affidavit documenting such fees and expenses, all of which we find reasonably incurred and with reasonable hourly rates for counsel of similar experience in the Philadelphia area. We will therefore award $11,-680.45 for counsel fees and for the expenses necessarily, and economically, incurred in this suit.

## JUDGMENT AND FINAL DECREE

AND NOW, this 28th day of April, 1993, after a trial in this action, and based upon the findings of fact and conclusions of law adopted pursuant to Fed.R.Civ.P. 52(a) set forth in the foregoing Memorandum, it is hereby ORDERED and DECREED that:

1. Judgment is entered in favor of plaintiff Harold F. Curtis and against defendant Robern, Inc. in the amount of $60,267.32;

2. Robern, Inc. is directed to reinstate Harold F. Curtis as a warehouseman, or in a comparable position, effective May 1, 1993, without loss of seniority, compensation, or benefits by reason of the layoff found to have been unlawful in this action;

3. Plaintiff is awarded, and defendant shall pay, a reasonable attorney's fee in the amount of $10,365.00, and the costs of this action in the amount of $1,315.45, for a total fee plus costs of $11,680.45.