Ellen MASTERSON

v.

LaBRUM AND DOAK.

Civ. A. No. 93–2434.

United States District Court,
E.D. Pennsylvania.

Dec. 17, 1993.

Alice W. Ballard, Samuel & Ballard, P.C., Philadelphia, PA, for plaintiff.

Jane L. Dalton, Duane, Morris & Heckscher, Philadelphia, PA, for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

NEWCOMER, District Judge.

After an eight day trial tried to both bench and jury on November 29–December 8, 1993, and after considering the testimony of the witnesses, the admitted exhibits and the arguments of counsel, the court makes the following findings of facts and conclusions of law.[1]

### FINDINGS OF FACT

1. Plaintiff Ellen Masterson is a 1983 graduate of Villanova University Law School. Following her graduation from law school plaintiff clerked for Justice James T. McDermott of the Pennsylvania Supreme Court for approximately fourteen months.

2. Defendant LaBrum and Doak is a partnership engaged in the practice of law. It has offices in Philadelphia, Norristown, Bethlehem, New York and New Jersey.

3. LaBrum and Doak has a five member Executive Committee that is responsible for much of the operation of the firm and carries substantial influence with the partnership as a whole. Some matters within the firm may be resolved solely by the Executive Committee while others require a vote of the entire partnership.

4. The Executive Committee has three seats that are subject to reelection yearly

---

1. This case was brought under Title VII of the Civil Rights Act of 1964, alleging, *inter alia*, acts of discrimination on the basis of sex in 1991 and 1992. Title VII was amended in late 1991. Prior to the amendment, the statute mandated bench trials without juries in Title VII cases. Title VII as amended entitles a plaintiff to a jury trial. The amendments to Title VII are prospective, not retroactive. The alleged acts of discrimination in 1991 occurred prior to the amend-

ments to Title VII and the alleged discrimination in 1992 occurred after. Therefore, this case was tried to the bench on the 1991 claim and to a jury on the 1992 claim.

The fact that a jury reached a verdict on the 1992 claim is not dispositive of the 1991 claim. While much of the evidence in the case is relevant to both claims, many essential facts and times have particular relevance to only one claim.

and two seats that are not. For virtually the entire period relevant to this case the three constant members of the Executive Committee have been Daniel Ryan, Perry Bechtle and Zachary Estrin. Mr. Ryan was widely regarded as the most powerful single influence in the firm, followed by Mr. Bechtle. Mr. Ryan held the title of Managing Partner.

5. In late 1989 and into 1990 Messrs. Ryan and Bechtle agreed with the firm that they would gradually remove themselves from the active management of the firm. Since January 1, 1992, Mr. Estrin has been the Chairman of the Executive Committee and James Hausch has been the firm's Administrative Partner. These two share the duties that Mr. Ryan once performed alone as Managing Partner.

6. Ellen Masterson was hired by LaBrum and Doak in December of 1984. Plaintiff began working in the firm's asbestos litigation department under the supervision of a partner, John Ledwith. Plaintiff continued to work in the asbestos department for approximately one year until the firm lost its principal asbestos client who produced annual billings in excess of two million dollars.

7. Seven to nine other associates worked in the asbestos department at the time plaintiff did.

8. After the asbestos client left the firm the associates in the asbestos department began to work in other departments of the firm. Plaintiff continued to work for Mr. Ledwith. Plaintiff's work for Mr. Ledwith was in the field of general negligence defense litigation, with some exposure to specialized cases (such as architectural liability).

9. In the fall of 1990 plaintiff went "on her own" meaning that she began to take full responsibility for her caseload, rather than working under the supervision of a partner.

10. Plaintiff would have gone "on her own" approximately six months before she did but she was asked to continue assisting Mr. Ledwith because he found the performance of the associate hired to replace Ms. Masterson on his cases to be unsatisfactory.

11. In 1990 and 1991, though she was "on her own," plaintiff performed a substantial amount of her work on cases for a partner named John Seehousen, at his request.

12. Approximately 75 per cent of the cases plaintiff handled "on her own" were to be tried to a jury; 25 per cent were arbitration cases. In her career, plaintiff has tried five jury cases to verdict and conducted many arbitrations. She has examined and cross-examined expert witnesses in both discovery and trial depositions.

13. Plaintiff's performance was reviewed by Mr. Ledwith in 1985–1990 and by Mr. Seehousen in 1990–1992. These performance reviews rated plaintiff highly in terms of her ability as a lawyer and her relationships with clients. Ms. Masterson's performance reviews, while always strong, improved with each year she was at the firm, especially in terms of her legal abilities.

14. The firm kept data on associates' hours, billings, and receipts for each year. These hours reflected the number of hours of associate time billed to clients. Billings were the amount of money clients were charged for the associate's work, calculated by multiplying the total hours billed by an associate times the associate's hourly rate. Receipts reflected the amount of the billings that were actually collected from the clients during the year. Data reflecting hours, billings and receipts were presented to the partnership for consideration for each associate who was eligible for partnership in a given year.

15. Plaintiff consistently met or exceeded 2000 hours per year in billables, the minimum number of hours per year required for admission to partnership.

16. In 1988 LaBrum and Doak retained Hildebrandt, Inc., a management consulting firm that specialized in consulting to law firms. Hildebrandt prepared a report detailing its conclusions which report was not distributed to each partner. In late 1988 the partnership of LaBrum and Doak conducted a "retreat" at Eagle Lodge to discuss the Hildebrandt report. Charles Santangelo, a consultant from Hildebrandt, was present at the retreat. No associates from LaBrum and Doak were present.

17. The Hildebrandt report predicted that if the firm failed to make substantial

changes in the way it operated it would not be able to survive.

18. The report criticized the manner in which the firm's corporate department operated and made suggestions about how the department could be improved. These criticisms and suggestions were raised at the retreat as well. The firm responded by installing Mr. Hausch, a partner, as the head of the department.

19. Other suggestions were presented at the retreat. The firm was advised to upgrade its client base so as to handle more sophisticated work for which higher rates could be charged. Related to this was the suggestion that partners should attempt to develop specialties that would enhance their marketability.

20. The firm was advised to raise its criteria for partnership and apply the criteria rigidly. It was recommended that the firm increase its partner to associate ratio.

21. The firm was also advised to concentrate more on the development of new business.

22. Traditionally, before the firm voted on the admission of new partners the Executive Committee would review the candidates eligible for partnership and then make recommendations to the entire partnership about how to vote on each candidate. These recommendations were generally followed by the partnership as a whole.

23. This procedure was followed in 1990 when four men, David Parcells, Paul Silver, Robert Coleman and Conrad Kattner, were eligible for partnership consideration. The Executive Committee recommended Mr. Parcells and Mr. Silver and did not recommend Mr. Coleman or Mr. Kattner. Mr. Parcells and Mr. Silver were elected to partnership. Mr. Kattner was a skilled lawyer but had not met the minimum billing requirement and was wrongly considered by some partners to have mishandled some cases.

24. In 1991 eight associates were eligible for partnership, seven of them for the first time and one for the second. Of the first time candidates five were male, two were female. The candidate up for the second time was male. Partnership meetings were held before the vote on the eight candidates in which the candidates were discussed and data regarding their hours, billings and receipts were presented.

25. The candidates eligible for the first time were Carl Fogelberg, Jay Gebauer, Douglas Kent, Stephen Kreglow, Ellen Masterson, Lisa Passante and Patrick Vitullo. The candidate eligible for the second time was Conrad Kattner.

26. A dispute arose among the partners about whether the number of partnerships to be offered in 1991 should be limited because of the economic conditions facing the firm. Eventually, no limitation was placed on the number of partnerships to be offered.

27. The Executive Committee was unable to reach a consensus on recommendations to be made to the entire partnership regarding the eight candidates.

28. Each member of the Executive Committee prepared a list ranking the candidates in order of preference. These lists were then compiled into one list and presented to the partnership.

29. Plaintiff was ranked eighth of the eight candidates on the list presented to the partnership.

30. Of the eight candidates for partnership in 1991 five were elected. These five, Carl Fogelberg, Jay Gebauer, Douglas Kent, Stephen Kreglow, and Patrick Vitullo, were all being considered for the first time and were all male. The two women up for the first time, Lisa Passante and Ellen Masterson, were not elected. Conrad Kattner, a male being considered for the second time, was not elected.

31. Conrad Kattner is a highly skilled attorney who concentrated on complex litigation. His work was praised by the vast majority of partners at LaBrum and Doak who had knowledge of his efforts, most notably Mr. Bechtle, who had the greatest familiarity with Mr. Kattner's work. Clients of the firm also lauded Mr. Kattner's efforts.

Mr. Kattner was denied partnership in 1991 because of the opposition of a group of partners to his candidacy. This opposition resulted from the perception that Mr. Katt-

1228

ner had mishandled some cases, jeopardizing the firm's clients. Those opposing Mr. Kattner's candidacy failed to investigate fully the basis of their conclusions. Had they done so they would have concluded that Mr. Kattner had not made the errors of which he was accused.

32. Mr. Fogelberg is an attorney of considerable experience who was managing the firm's New York office before the 1991 partnership election. Mr. Fogelberg, before joining LaBrum and Doak, was employed as in-house counsel at a large insurance company and was able to bring a substantial amount of business into LaBrum and Doak through the contacts he had developed while at the insurance company. Mr. Fogelberg is a skilled attorney. LaBrum and Doak hired Mr. Fogelberg to manage the New York office with the understanding that he would be considered for elevation to partner in 1991 if he performed well. He did perform well, and the firm honored its commitment to him by electing him to partnership.

33. Mr. Gebauer is a skilled attorney who also developed a significant amount of business for the firm's New Jersey office. He had the overwhelming support of the partners in the New Jersey office. For these reasons, he was elected to partnership.

34. Mr. Kent is a skilled attorney who had developed some business. He was considered by some to have an abrasive personality and to mistreat those who worked under him.

35. Mr. Vitullo is a skilled workers' compensation attorney who had developed some business.

36. Ms. Passante is also a skilled attorney. She had, in late 1990, agreed to abandon her own caseload to act as the second in command on a large number of asbestos cases that the firm had received. She was told that taking on this assignment would enhance her bid for partnership.

37. Ms. Masterson is a skilled attorney with substantial trial and arbitration experience. Ms. Masterson's billables were higher than most of those being considered for partnership in 1991. She had earned the confidence of those clients that she performed

work for. She had also developed some business for the firm.

38. Ms. Masterson and Ms. Passante were as qualified for partnership in 1991 as the males elected.

39. Ms. Masterson received associate evaluations in 1990 from Mr. Ledwith and Mr. Seehousen. Both reviews were excellent. Mr. Ledwith rated plaintiff overall a four plus on a five point scale (a rating of five represents "Excellent in Every Respect" and a rating of four represents "Excellent With Respect to Established Partnership Criteria"). Mr. Ledwith rated Ms. Masterson a four for client potential. The comment section of Mr. Ledwith's review states that Ms. Masterson "handles clients well."

Mr. Seehousen did not give Ms. Masterson an overall rating, but did rate her a four or five in all areas with the exception of Organizational Ability where he rated her as between three and four. He noted that all of Ms. Masterson's dealings with clients had resulted in positive feedback, and in one case a client had specifically requested her to handle the work. Mr. Seehousen considered plaintiff to be "a great asset to the firm."

40. Client development was one factor considered by the partnership in the 1991 partnership election. Plaintiff was not informed prior to the election that client development was an established partnership criterion.

41. Mr. Kent and Mr. Vitullo were told during their April 1990 associate reviews that client development was one of three partnership criteria. Mr. Kent was also informed that "not much is expected of associates insofar as client production is concerned", but that he had exhibited mature skills in relations with existing clients. Client production was emphasized in Mr. Gebauer's 1990 review.

42. Ms. Masterson and Ms. Passante were not specifically told during their April 1990 reviews that client development was a partnership criterion. In fact, Ms. Passante was informed that she met the partnership criteria at her 1990 review. She was informed that her record was "exemplary with respect to all of the important aspects of

partnership criteria, including billings, receipts, and legal ability"; no mention of client development was made. At Ms. Masterson's review it was noted that she had been developing good relationships with existing clients and that she was conscious of the need to develop these relationships with existing and potential clients. She was not informed, as were Messrs. Kent, Gebauer and Vitullo, that client production was a necessary criterion for partnership.

43. Prior to the 1991 partnership election the Executive Committee presented no data to the partnership regarding the amount of business that each associate eligible for partnership generated. This prevented the partners from learning that Ms. Masterson had actually brought business into the firm. The partners instead believed that Ms. Masterson had developed no business.

44. Mr. Gebauer was asked to prepare a list of clients that he had developed and of his hours, billings and receipts for review by Peter Neeson, a partner, in 1990. Ms. Masterson was not asked to prepare such a list.

45. Ms. Masterson had developed business prior to the partnership election in 1991. This fact was not revealed to the partnership at any meeting prior to the election. Virtually no partners were aware of this fact, nor did any partner make any effort to discover this fact.

46. The fact that development of business was a formal criterion for admission to partnership was not announced to all of the firm's associates until 1991. This announcement came too late for the 1991 candidates for partnership to make efforts to meet the criterion.

47. Business development at LaBrum and Doak was controlled in large part by the firm's Marketing Committee which had to approve all expenditures related to business development. The Marketing Committee also controlled the choice of professional organizations to which the attorneys at the firm could belong.

48. When Mr. Parcells was being considered for partnership in 1990 some partners expressed concern with his lack of trial experience, even though trial experience was not an established partnership criterion. Mr. Parcells was elected to partnership despite his lack of trial experience, however, because the partnership felt that it would not be fair to "change the rules" on Mr. Parcells by denying him partnership for a reason he had no advance notice of.

49. Prior to the 1991 partnership election Ms. Masterson had no notice that business development was a partnership criterion. Despite this, the partnership used her perceived lack of business development as a basis for denying her partnership. The partnership did not demonstrate in Ms. Masterson's case the unwillingness to "change the rules" that it demonstrated in Mr. Parcell's case.

50. The combination of hours, billings and receipts was an established partnership criterion. Ms. Masterson's statistics for hours billed and billables were comparable or superior to those of the males elected to partnership in 1991. Ms. Masterson's receipts were slightly lower than those of the males elected to partnership. Receipts, however, are not an accurate indication of the effort or quality of an associate's work because they are dependent on the billing practices of individual clients and not the actions of associates.

51. Ms. Masterson had tried several cases to jury verdicts prior to the 1991 partnership election. This fact was not revealed to the partnership at any meeting prior to the election. Virtually no partners were aware of this fact, nor did any partner make any effort to discover this fact.

52. Those associates who were to be considered for partnership in 1991 received their 1990 evaluations from Mr. Ryan and either Mr. Bechtle or Mr. Estrin. The purpose of this was to permit the associates a chance to present themselves to the "upper management" of the firm. Such an opportunity would aid an associate in the partnership election.

53. Ms. Masterson did not receive a 1990 review from "upper management" because at the time of her review the firm considered her partnership eligible in 1992. At her 1990 review Ms. Masterson pointed out that this 1992 date failed to give her credit for her

clerkship with the Pennsylvania Supreme Court. Following this review Ms. Masterson's eligibility date was moved to 1991. She was not, however, given a review by "upper management" after her eligibility date was changed.

54. The lack of a 1990 review with "upper management" deprived Ms. Masterson of the opportunity to acquire all of the information necessary to maximize her partnership eligibility. For example, Ms. Masterson was never told that business development was one of three partnership criteria.

55. During her 1990 associate review Ms. Masterson was informed that she was perceived as being in Mr. Ledwith's "shadow." She informed her reviewers that Mr. Ledwith did not permit her to work for any partner other than himself. The firm made no effort to speak with Mr. Ledwith to rectify this problem.

56. Leslie Miller was elected to partnership in LaBrum and Doak in 1982. She was the first female elected to partnership at the firm and the only female partner at the firm during her tenure there.

57. In 1986, the firm asked seven of its partners to leave, citing economic concerns caused by the loss of a two million dollar per year client. Leslie Miller was one of the seven partners asked to leave. The remaining six were males.

58. The six males asked to leave the partnership were asked to do so for specific reasons. For example, one was an alcoholic, one was having fees which should have been sent to the firm sent to him directly, one lacked legal skills, and another failed to bring in business that he promised the firm he would generate.

59. Leslie Miller is an excellent attorney who had good relationships with clients and an outstanding reputation in both the Pennsylvania and Philadelphia Bar Associations, where she held leadership positions. Her forthright testimony on the stand and her style and demeanor further enhanced her credibility and attested to her exceptional professional competence.

60. Leslie Miller was asked to leave the firm because she did not "fit in." Some partners involved in the decision to ask Ms. Miller to leave the firm believed that Ms. Miller had committed errors of professional judgment with regard to two asbestos clients she represented. These beliefs were unfounded. Ms. Miller was never given the opportunity to correct the misperceptions held by the partners who sought her expulsion from the partnership. The fact that Ms. Miller is a female was a substantial factor in the firm's decision to terminate her.

61. Patricia Bill was an associate in the firm's environmental department. Ms. Bill was a skilled attorney in her specialty. She wrote articles and taught seminars in the area of environmental law. She had developed a substantial client base and handled large cases with little or no supervision. Ms. Bill's hours, billings and receipts were among the highest in the firm, higher than the vast majority of associates and even most partners.

Ms. Bill had personality conflicts with several attorneys at LaBrum and Doak. Ms. Bill was viewed by some as arrogant and overly aggressive. Ms. Bill was terminated by the firm.

62. Mr. Kent's qualifications are summarized above in finding number 34. Mr. Kent had personality conflicts with several attorneys at the firm. Concern was expressed that Mr. Kent mistreated those who worked under him. Mr. Kent was elected to partnership.

63. Jonathan Herbst is a partner at LaBrum and Doak. On several occasions he has had confrontations with those who worked under him. For example, in the fall of 1991 he used profanity several times while berating an associate who was working on a dental malpractice case under his supervision. The associate complained to Mr. Ryan, who reprimanded Mr. Herbst. No further action was taken against Mr. Herbst.

64. After Ms. Miller left the firm in 1986, LaBrum and Doak did not have another female partner until 1990 when Barbara Hollenbach came to the firm through its merger with Holland, Taylor and Hollenbach.

65. In late 1991 Mary Jacobs was brought into LaBrum and Doak as an associate. Immediately prior to joining the firm she had been a partner at a comparable Philadelphia firm. Ms. Jacobs was required to remain at LaBrum and Doak for approximately one year before being elevated to partner. All male attorneys who were brought to LaBrum and Doak from partnerships at other firms were hired as partners.

66. In 1985 Ms. Passante was preparing to try a case on appeal from an arbitration award. The client informed James Wilder, the partner supervising the case, that it did not want a woman to try the case. Mr. Wilder removed Ms. Passante from the case despite the fact that he was impressed with her work on the file and that he saw no reason that she could not have tried the case, perhaps to a more successful resolution than he could.

67. Mr. Estrin occasionally refers to women in a degrading manner and he occasionally uses profanity in the office, though not intending it to be heard publicly. He makes comments of a sexual nature while in the office, intending them to be private. He does not believe he makes such comments in front of women. Mr. Estrin's comments, however, have been heard by female attorneys at the firm.

68. Shortly after Ms. Miller was hired by LaBrum and Doak she was introduced by Mr. Ryan to two judges as "the new broad we just hired." Mr. Ryan intended the comment to be a joke and so explained it to the judges. Ms. Miller nonetheless was offended by the comment.

69. After Ms. Masterson was denied partnership she spoke with Mr. Ledwith who stated to her: "Now you know how it feels to be black." Mr. Ledwith had been representing a fraternity which believed itself to be the object of discrimination. Mr. Ledwith felt great empathy for the members of the fraternity.

70. LaBrum and Doak historically has treated female attorneys differently than male attorneys.

71. Since the Hildebrandt report was received in 1988 LaBrum and Doak has elected partners at a substantial rate, including two in 1990 and five in 1991. The firm has also accepted partners through the merger with Holland, Taylor and Hollenbach. This fact is inconsistent with the firm's stated concern with its partner to associate ratio.

72. Plaintiff earned $20,125.00 less in 1991 than she would have had she been elected to partnership in 1991.

73. Plaintiff earned $18,448.00 less in 1992 than she would have had she been elected to partnership in 1991.

74. No evidence was introduced as to plaintiff's 1993 salary or the partnership earnings in 1993. Nevertheless, it may reasonably be determined that the differential between plaintiff's salary in 1993 and the amount she would have earned as a partner in 1993 would be no less than the $18,448.00 differential from 1992.

## CONCLUSIONS OF LAW

1. After the close of evidence in this case plaintiff submitted to the Court a request to consider this case solely as a pretext case. Plaintiff specifically withdrew the case from consideration under a mixed motive theory. Defendant has not objected to plaintiff's request. Therefore, this Court will grant plaintiff's request and analyze the case as a pretext case.

2. The plaintiff has fully complied with the administrative prerequisites for suit under Title VII. 42 U.S.C. § 2000e–5.

3. In a pretext case a plaintiff first must establish by a preponderance of the evidence a prima facia case of discrimination. *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 252, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981); *Ezold v. Wolf, Block, Schorr and Solis–Cohen*, 983 F.2d 509, 522 (3d Cir.1992), *cert. denied*, —— U.S. ——, 114 S.Ct. 88, 126 L.Ed.2d 56 (1993).

4. A plaintiff may establish a prima facia case by establishing that she is a member of a protected class; that she was qualified for a position and rejected; and that non-members of the protected class were treated more favorably. *Ezold*, 983 F.2d at 522; *Roebuck*

*v. Drexel Univ.*, 852 F.2d 715, 726 (3d Cir. 1988).

■ 5. A plaintiff may meet this initial burden by demonstrating that she "was sufficiently qualified to be among those persons from whom a selection, to some extent discretionary, would be made." *Ezold*, 983 F.2d at 523 (quoting *Bennun v. Rutgers State Univ.*, 941 F.2d 154, 171, *cert. denied*, —— U.S. ——, 112 S.Ct. 956, 117 L.Ed.2d 124 (1992)). A prima facia case is easily made out. *Healy v. New York Life Ins. Co.*, 860 F.2d 1209, 1214 n. 1 (3d Cir.1988), *cert. denied*, 490 U.S. 1098, 109 S.Ct. 2449, 104 L.Ed.2d 1004 (1989).

■ 6. Plaintiff has demonstrated that she was qualified for partnership consideration. The favorable evaluations that plaintiff received from Messrs. Ledwith and Seehousen are sufficient to support this conclusion. *See Ezold*, 983 F.2d at 523 (favorable evaluations from partners sufficient to establish qualification).

■ 7. Once a plaintiff has established a prima facia case the burden shifts to the defendant to produce evidence of a legitimate, nondiscriminatory reason for its decision regarding the plaintiff. *Burdine*, 450 U.S. at 252, 101 S.Ct. at 1093. If the defendant produces evidence which creates a genuine issue of fact the presumption of discrimination is removed from the case. *Id.* at 254–55, 101 S.Ct. at 1094–95.

■ 8. LaBrum and Doak introduced evidence that it denied partnership to plaintiff because she failed to develop business for the firm. This evidence creates a genuine issue of fact as to the reasons for plaintiff's partnership denial.

9. Placing the burden of production on the defendant serves two purposes. First, it meets the plaintiff's prima facia case; and establishes a genuine issue of fact for resolution. Second, it "frame[s] the factual issue with sufficient clarity so that the plaintiff will have a full and fair opportunity to demonstrate pretext." *Burdine*, 450 U.S. at 255–56, 101 S.Ct. at 1094–95.

10. LaBrum and Doak has therefore framed the issue in this case as whether the reason advanced for plaintiff's partnership denial, that she failed to develop business, was a legitimate reason or a pretext for a discriminatory reason.

■ 11. Once a defendant meets its burden of production, the burden shifts back to the plaintiff to prove by a preponderance of the evidence that the defendant's proffered reasons were a pretext for discrimination. *Burdine*, 450 U.S. at 257, 101 S.Ct. at 1095; *Ezold*, 983 F.2d at 522. This burden merges into the plaintiff's ultimate burden of proving that she was the victim of intentional discrimination. *Ezold*, 983 F.2d at 523.

■ 12. A plaintiff can establish pretext "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered reason is unworthy of credence." *Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095.

■ 13. Evidence of an employer's past treatment of the plaintiff may be sufficient to establish pretext. *Ezold*, 983 F.2d at 523 (citing *Patterson v. McLean Credit Union*, 491 U.S. 164, 188, 109 S.Ct. 2363, 2378, 105 L.Ed.2d 132 (1989) and *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 804, 93 S.Ct. 1817, 1825, 36 L.Ed.2d 668 (1973)).

14. The employer's general policy and practice with regard to the employment of females may also be relevant. *McDonnell Douglas*, 411 U.S. at 804–05, 93 S.Ct. at 1825–26.

■ 15. Actions of an employer must apply equally to male and female employees. Differential treatment is evidence of pretext for discrimination. *McDonald v. Santa Fe Trail Transportation Co.*, 427 U.S. 273, 282–84, 96 S.Ct. 2574, 2579–81, 49 L.Ed.2d 493 (1976).

■ 16. Additionally, if the plaintiff proves that "the employer did not act for its proffered reason, then the employer's decision remains unexplained and the inferences from the evidence produced by the plaintiff may be sufficient to prove the ultimate fact of discriminatory intent." *Chipollini v. Spencer Gifts, Inc.*, 814 F.2d 893, 899 (3d

Cir.) (en banc), *cert. dismissed,* 483 U.S. 1052, 108 S.Ct. 26, 97 L.Ed.2d 815 (1987).

17. A showing that a proffered reason is pretextual compels a finding that the employer intentionally discriminated. *Duffy v. Wheeling Pittsburgh Steel Corp.,* 738 F.2d 1393, 1396 (3d Cir.), *cert. denied,* 469 U.S. 1087, 105 S.Ct. 592, 83 L.Ed.2d 702 (1984).

18. Ms. Masterson has established that the defendant's proffered reason for its refusal to elect her to partnership is pretextual. She has established that she was treated differently from the males who were eligible for partnership in 1991. Specifically, plaintiff has demonstrated that she was not informed that business production was an established partnership criterion prior to the partnership election in 1991 whereas Messrs. Kent, Gebauer and Vitullo were so informed. As a consequence, plaintiff was being judged by a standard that she was never given the opportunity to meet. This disparate treatment is evidence of pretext. *See McDonald,* 427 U.S. at 282–84, 96 S.Ct. at 2579–81.

19. Moreover, plaintiff had in fact generated some business prior to the partnership election in 1991. This fact was never made known to the partnership, though the partnership was aware of the business generated by the male candidates. No partners ever made any effort to determine what plaintiff's business production was.

Additionally, because Ms. Masterson was asked by Mr. Ledwith to continue to work for him after she was scheduled to be "on her own" and no action was taken by the firm to extricate her from this situation plaintiff did not have the same opportunity to develop business as those male associates who were "on their own." This is further evidence of pretext. *Id.*

20. LaBrum and Doak evidenced an historical pattern of treating males and females differently as demonstrated by the firings of Ms. Miller and Ms. Bill, the removal of Ms. Passante from a case because of her sex, the circumstances of Ms. Jacobs' hiring, and Ms. Passante's 1990 review where she was not informed that business production was a partnership criterion. The fact that LaBrum and Doak has had so few female partners in its history while in itself not sufficient to establish discriminatory practices nevertheless may be considered along with all of the other evidence. It lends support to the conclusion that discrimination was the motivating factor in the firm's decision with regard to Ms. Masterson. *See McDonnell Douglas,* 411 U.S. at 804–05, 93 S.Ct. at 1825–26 (evidence of employer's practice with regard to employment of women relevant to issue of discrimination).

21. Plaintiff also demonstrated that LaBrum and Doak operated, to an extent, in a discriminatory environment. For example, Mr. Ryan's reference to Ms. Miller as a "broad", even though intended to be humorous, warrants the conclusion that women were not regarded at the firm to be professional equals of men. Similarly, Mr. Estrin's use of demeaning comments regarding women, his use of profanity, and his comments of a sexual nature made while in the office and with little regard for whether women were present evidence an atmosphere in which women were not regarded as equals to men. Reflective of that environment was Mr. Ledwith's comment to Ms. Masterson that: "Now you know how it feels to be black." Such an atmosphere is suggestive of discrimination. *See McDonnell Douglas,* 411 U.S. at 804–05, 93 S.Ct. at 1825–26.

22. The defendant may well have considered business production in making its partnership decision. The Court does not mean to suggest that this would be an inappropriate criterion. The Court's decision is based, rather, on the fact that the plaintiff was never given the same opportunity as comparable males to meet this criterion because she was never adequately informed of it as were the male candidates prior to the partnership decision nor was she ever permitted to be fully "on her own" prior to the 1991 election.

Further supporting this finding of pretext is the firm's historical practice of treating women differently from men.

23. Plaintiff has succeeded in proving that LaBrum and Doak did not act for its proffered reason. This leaves the reason for the partnership denial explained by the infer-

ence of discrimination that this Court draws from plaintiff's evidence. The Court is satisfied that plaintiff has met her burden of establishing the ultimate fact of discriminatory intent. *See Chipollini*, 814 F.2d at 899.

An appropriate Order follows.

### ORDER

AND NOW, this 17th day of December, 1993, upon consideration of the testimony of the witnesses, the admitted exhibits and the arguments of counsel, and consistent with the foregoing findings of fact and conclusions of law, it is hereby ORDERED that judgment is entered in favor of the plaintiff, Ellen Masterson, and against the defendant, LaBrum and Doak, on plaintiff's claim that the defendant refused to promote her to partner in 1991 on the basis of her sex in violation of Title VII of the Civil Rights Act of 1964.

IT IS FURTHER ORDERED that plaintiff be immediately instated as a partner in defendant law firm.

IT IS FURTHER ORDERED that defendant pay to plaintiff the sum of $57,021.00 as back pay from the date of the wrongful denial of partnership to the present.

AND IT IS SO ORDERED.