Jay M. ARMBRUSTER, Plaintiff,

v.

ERIE CIVIC CENTER AUTHORITY, Defendant.

Civil Action No. 93–315 Erie.

United States District Court, W.D. Pennsylvania.

Sept. 30, 1995.

James D. McDonald, Daniel J. Pastore, James D. McDonald, The McDonald Group, Erie, PA, for defendant.

## MEMORANDUM OPINION AND ORDER

McLAUGHLIN, District Judge.

Plaintiff Jay M. Armbruster was employed as managing director for Defendant, the Erie Civic Center Authority ("ECCA" or the "Civic Center"), until his termination on April 28, 1992 at the age of 60. Following his termination, Armbruster filed this action against ECCA, alleging that Defendant's actions violated the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621 *et seq.*, and the Pennsylvania Human Relations Act ("PHRA"), 43 Pa.Stat. §§ 951 *et seq.* This Court has jurisdiction pursuant to 29 U.S.C. § 626(c)(1) and 28 U.S.C. §§ 1331, 1343(a)(4) and 1367.

Presently before the Court is Defendant's motion for summary judgment on both counts. For the reasons set forth below, Defendant's motion will be granted.

### I. BACKGROUND

The ECCA is a municipal authority created by the City of Erie. Over the years, the Civic Center has frequently operated with a deficit, requiring partial funding by the City pursuant to a contract between the two entities. Every fall the ECCA presents a preliminary budget to the Erie City Council members for approval.

In the fall of 1991, Plaintiff and various members of the ECCA's Board of Directors submitted a proposed budget to the City Council. The budget projected an operating deficit for the year 1992. By Plaintiff's own account, the encounter with City Council went "disastrously." (Armbruster Depo. Tr. at 39–40.) Because the City was experiencing financial difficulties at that time, City Council rejected ECCA's budget and indicated that the Civic Center would need to submit a new budget showing a substantially lower operating deficit. Laura Eaton, who would begin as the new Chairperson of ECCA's Board in January of 1992, stated she was embarrassed by this incident. She also

Richard T. Ruth, Erie, PA, for plaintiff.

developed "concerns about what was going on at the Civic Center." (Eaton Depo. Tr. at 16–17.)

Following this meeting with City Council, the budget was revised and efforts were made to reduce ECCA's deficit by increasing revenues and decreasing expenses. In January of 1992, the Board significantly reduced its projected deficit by, among other things, making two important changes: (1) laying off several employees and imposing a hiring freeze; and (2) raising the service charge on tickets from $0.25 to $0.75 per ticket. These changes were incorporated into the Civic Center's 1992 budget as finally adopted by the Board. Plaintiff himself acknowledged that in early 1992 the budget was "the big thing on everybody's mind." (Armbruster Depo. at 46.) Laura Eaton described the increased surcharge as "critical for us to help balance the budget," because "City Council had told us that they were not going to give us more money" and "it was up to us to make changes and balance the budget," because "the taxpayers could no longer afford to subsidize us with large amounts of money." (Eaton Depo. Tr. at 24–25.)

In early 1992, several new Board members were elected and the Board took a different direction than in years past. In January, Eaton requested that Sean Sullivan, a local certified public accountant, undertake a review of the Civic Center's financial condition and make recommendations. Upon review of the ECCA's records and information systems and discussions with employees about the Civic Center's finances, Sullivan concluded that "the place was just bleeding to death." (Sullivan Depo. Tr. at 50.)

Sullivan then prepared a memorandum summarizing his findings. Gery Nietupski, a then thirty-two year old member of the Board, requested that Sullivan's memorandum be converted into a "performance evaluation" of Armbruster.[1] (Sullivan Depo. at 32.) That evaluation, in its entirety, provided as follows:

(1) Jay did not display the management skills needed to lead the Center through its financial difficulties:

 (a) lack of recognition to the City of Erie's direction toward defunding the Center.

 (b) Lack of management control to effectuate cost savings measures in light of prospective cash flow deficits.

 (c) Lack of management initiative to review and revise pricing structure of facilities in order to cover fixed costs.

 (d) Implementation of personnel policies which were not uniformly applied to all employees.

 (e) Lack of personnel skills relating to effective use of Center parttime personnel to effectively generate the maximum return to the Center.

 (f) Lack of management skills relating to establishment of an effective and timely information recovery system which could be utilized for financial analysis.

(2) Jay did not consistently apply Center rentals to events as evidence by varying rentals for similar events.

(3) Jay did not effectively carryout [sic] the specific directions of the Authority's Board:

 (a) Implementation of revised ticket surcharge was undertaken by Jay on a selective basis.

 (b) Implementation of ticket surcharge was not controlled by Jay which resulted in the Center losing surcharge income of numerous ticket sales.

 (c) Hiring of parttime accounting personnel when such hirings were specifically suspended by the Board.

 (d) Numerous requests for insurance and other financial information of the Center, requested by Authority Board members, were never fulfilled by Jay.

(4) Jay did not display the financial knowledge of Center event or operating breakeven levels needed to effectively price events and maintain a steady and

---

1. Apparently, this original memorandum has not been located by either party. However, the performance evaluation is in essence the same document, except that information in ¶¶ 1(d) and 3 of the evaluation was conveyed to Sullivan by Eaton. (Sullivan Depo. at 26–27.)

consistent stream of cash flow. Again, Jay's approach was the City of Erie would cover any and all operating deficits. The motivation to minimize Center operating deficits was not consistently displayed by Jay.

(5) Jay did not display the ability to maintain the lowest possible operating costs for the Center. Insurance contracts, professional fees and other costs were not regularly reviewed and competitively bid to ensure maximum utilization of resources.

(Def.'s Append. Ex. 8.)

Sullivan later summarized the message behind this evaluation: "I felt that Jay did not have the skills to function as the managing director of the Civic Center financially." (Sullivan Depo. at 38.) The contents of Sullivan's memorandum were discussed at the Board's March, 1992 meeting. Defendant avers that Board members at that time believed, and discussed the fact, that Plaintiff had violated the Board's directives to increase the ticket service charge to $0.75 and to suspend hiring of employees. At this meeting, the Board decided to place Armbruster on forced vacation status. Following the meeting, the Board requested Armbruster's resignation, but he refused to resign. Consequently, at the Board's next meeting on April 28, 1992, the Board voted seven to two to terminate Plaintiff's employment. Two members dissented on the ground that they believed Armbruster should have been given more of an opportunity to ameliorate the problems concerning the Board.

Following Plaintiff's termination, the Board appointed the operations manager, John "Casey" Wells, as acting managing director in Armbruster's place. At the time, Wells was less than 40 years of age. There is unrebutted evidence that, following Wells' appointment, the Civic Center implemented many of Sullivan's recommendations. There is further unrebutted evidence that, at the end of 1992, the Center showed a net income of $34,919.00 as opposed to a net loss in 1991 of $153,866.00. In 1993, the ECCA showed a net income of $82,901.00. (Wells. Affid. Exs. R, S, T.)

Following his discharge, Plaintiff filed the present action alleging violations under the ADEA and PHRA.[2] Defendant has moved for summary judgment on both claims.

## II. *STANDARD OF REVIEW*

Entry of summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A dispute regarding a material fact is "genuine" if the evidence is such that "a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

The moving party, of course, has the initial burden of demonstrating that no genuine issue of material fact exists. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). Thereafter, the burden shifts to the non-moving party to demonstrate that there is a genuine issue for trial. *Id.* at 324, 106 S.Ct. at 2553; Fed.R.Civ.P. 56(e). All inferences to be drawn from the underlying facts must be viewed in the light most favorable to the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962). However, when the record taken as a whole is such that it will not support a rational finding that an essential element of the nonmoving party's case exists, summary judgment must be entered for the moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *Turner v. Schering–Plough Corp.*, 901 F.2d 335, 341 (3d Cir.1990).

---

**2.** Plaintiff also filed charges with the Equal Employment Opportunity Commission and the Pennsylvania Human Relations Commission.

The Court has no record of any determination by these agencies.

## III. DISCUSSION

### A. Plaintiff's ADEA Claim [3]

█ In a "pretext" age discrimination action under the ADEA,[4] the plaintiff has the initial burden of establishing a prima facie case by demonstrating that he or she: (1) is a member of the protected group; (2) was qualified to perform the job at issue; (3) was discharged despite being qualified for the position; and (4) was replaced by another employee sufficiently younger to permit an inference of age discrimination. *Armbruster v. Unisys Corp.*, 32 F.3d 768, 777 (3d Cir. 1994); *Maxfield v. Sinclair Int'l*, 766 F.2d 788, 792–93 (3d Cir.1985), *cert. denied*, 474 U.S. 1057, 106 S.Ct. 796, 88 L.Ed.2d 773 (1986); *Naas v. Westinghouse Elec. Corp.*, 818 F.Supp. 874, 877 (W.D.Pa.1993).

█ Assuming that a plaintiff can demonstrate a prima facie case of discrimination, the defendant then has the burden of producing some legitimate, non-discriminatory explanation for its employment action. *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 1093–94, 67 L.Ed.2d 207 (1981); *Armbruster, supra*, at 778. Once a defendant meets this burden of production, any presumption of discrimination drops from the case and the plaintiff must then offer evidence tending to show that the defendant's explanation is a mere pretext for discrimination. *Burdine*, 450 U.S. at 254–56, 101 S.Ct. at 1094–95; *Armbruster, supra*, at 778.

█ The plaintiff's ultimate burden at trial will be to demonstrate by a fair preponderance of the evidence (1) that the employer's proffered explanation is pretextual, *and*

(2) that the discriminatory motive was the true reason for the adverse action. If the factfinder does not believe defendant's explanation, such a finding—together with the elements of the prima facie case—*may* allow (but does not *require*) the factfinder to infer the ultimate fact of intentional discrimination. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 510–11, 113 S.Ct. 2742, 2749, 125 L.Ed.2d 407 (1993); *McKenna v. Pacific Rail Serv.*, 32 F.3d 820, 826 (3d Cir.1994); *Armbruster, supra*, at 783; *Seman v. Coplay Cement Co.*, 26 F.3d 428, 433 (3d Cir.1994). To prevail at trial, the plaintiff must persuade the fact finder that age *actually* played a role in the adverse employment decision and that it was *a determinative factor* in the outcome. *Armbruster, supra*, at 778 and n. 12; *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir.1994) (citing *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 113 S.Ct. 1701, 123 L.Ed.2d 338 (1993)).

█ The Court finds that Plaintiff has sufficiently demonstrated a prima facie case of age discrimination. It is not disputed that Plaintiff is a member of a protected class (i.e. individuals over the age of 40), was discharged by ECCA, and was ultimately replaced by a younger individual not within the protected class. In addition, Defendant assumes for purposes of this motion that Armbruster was "qualified" for the position of managing director and that he can satisfy his prima facie case under *McDonnell Douglas*. The Court will likewise assume Armbruster's qualifications for purposes of his establishing a prima facie case.[5]

---

3. Although this case is premised on alleged age discrimination, reference is made throughout this opinion to Title VII cases, as the analysis used in describing the evidentiary burdens in Title VII cases is often used in ADEA cases. *Armbruster v. Unisys Corp.*, 32 F.3d 768, 777 n. 10 (3d Cir.1994); *Seman v. Coplay Cement Co.*, 26 F.3d 428, 432 n. 7 (3d Cir.1994); *Duffy v. Wheeling Pittsburgh Steel Corp.*, 738 F.2d 1393, 1396 (3d Cir.), *cert. denied*, 469 U.S. 1087, 105 S.Ct. 592, 83 L.Ed.2d 702 (1984).

4. The Court acknowledges that different legal analyses apply depending on whether a case is classified as a "mixed motives" case under *Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989), or a "pretext" case governed by *McDonnell Douglas Corp. v.*

*Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and its progeny. In the present action, both parties have proceeded on the assumption that this is a pretext case. The Court sees no reason to disagree and will likewise adopt this analysis.

5. We observe that, under the law of this Circuit, "the burden of making out a prima facie case is not onerous." *Fowle v. C & C Cola, a Div. of ITT–Continental Baking Co.*, 868 F.2d 59, 65 (3d Cir.1989) (citing *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. at 253, 101 S.Ct. at 1093–94). *See also Ezold v. Wolf, Block, Schorr and Solis–Cohen*, 983 F.2d 509, 523 (3d Cir. 1992) (because the prima facie case is easily made out, it is rarely the focus of the ultimate disagreement) (citation omitted), *cert. denied*, 510

■ The Court further finds that Defendant has produced evidence sufficient to satisfy its burden of articulating a legitimate, nondiscriminatory reason for Armbruster's termination. Specifically, the Defendant has raised three separate nondiscriminatory reasons for Armbruster's discharge: (1) Armbruster's failure to uniformly implement the $0.75 per ticket service charge; (2) his violation of the hiring freeze by hiring a temporary employee, Tamara Green, as a permanent part-time employee in ECCA's accounting department; and (3) Sean Sullivan's conclusions about Armbruster's managerial performance as conveyed to the Board.

■ Thus, the issue for the Court is whether Armbruster has produced sufficient evidence to rebut the Defendant's proffered reasons such that a reasonable jury could find them pretextual. In *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir.1994), the Third Circuit specifically considered the evidence that an employment discrimination plaintiff must adduce in order to survive summary judgment when the defense offers a legitimate reason for an adverse employment action. The court held that, in order to defeat a motion for summary judgment under these circumstances:

> the plaintiff generally must submit evidence which: (1) casts sufficient doubt upon each of the legitimate reasons proffered by the defendant so that a factfinder could reasonably conclude that each reason was a fabrication; or (2) allows the factfinder to infer that discrimination was more likely than not a motivating or determinative cause of the adverse employment action.

32 F.3d at 762. *See also Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095; *Armbruster*, 32 F.3d at 783; *Ezold*, 983 F.2d at 523. The evidence may be circumstantial or direct in nature but, in any event, it must allow the finder of fact to reasonably infer that each of the employer's proffered reasons was either a *post hoc* fabrication, or otherwise did not actually motivate the employment action.

*Fuentes*, 32 F.3d at 764. Moreover, in order to discredit the employer's proffered reasons, the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the issue in dispute is not whether the employer is wise, shrewd, prudent or competent, but whether the employer acted with a discriminatory motive. *Id.* at 765. Rather, the plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered reasons that a reasonable factfinder could rationally find them unworthy of credence. *Id.* (citations omitted). We address each of Defendant's proffered reasons under the foregoing standard.

1. *Plaintiff's Alleged Failure to Implement the $.75 Service Charge*

■ As discussed earlier, following its Fall, 1991 meeting with City Counsel, the ECCA took measures to increase revenue by, among other things, increasing the surcharge on tickets from $0.25 per ticket to $0.75 per ticket. Plaintiff acknowledges that this increased assessment was to apply to all contracts executed after January 2, 1992. Nevertheless, Defendant has presented evidence that, under Armbruster's management, at least three contracts were sent out after January 2, 1992 without inclusion of the $0.75 charge. The first contract concerned a March 23, 1992 event with the Erie Chapter of the American Cancer Society ("ACS"). The second was a contract with the Lake Erie Ballet. The third contract concerned a sporting event put on by the Pennsylvania Interscholastic Athletic Association. Each of these contracts provided for only a $0.25 surcharge rather than a $0.75 surcharge.

Significantly, Plaintiff does not deny that these contracts were permitted to go out after January 2, 1992 without the required $0.75 surcharge provision. Rather, with respect to the ACS contract, Plaintiff claims that he was under the mistaken impression that this would be a non-ticketed event "because that's the way they gave it to us[,] as a lobby reception." (Armbruster Depo. at 65.)

U.S. 826, 114 S.Ct. 88, 126 L.Ed.2d 56 (1993); *Turner v. Schering–Plough Corp.*, 901 F.2d 335, 342 (3d Cir.1990) (prima facie test requires a

plaintiff to demonstrate that he "was qualified by training and experience for the job from which he was discharged").

Therefore, he did not think much of the fact that the contract contained only a $0.25 surcharge provision because, with non-ticketed events, the surcharge would not apply at all. Plaintiff claims that, upon discovering that the event *was* ticketed, he informed the ACS that $0.75 per ticket would be charged which evoked strong opposition by ACS. According to Plaintiff, "the lid came off of the thing ... the [ECCA Board] chairman got a call from somebody on that committee, the chairman of their committee, saying that they refused to pay the service charge and besides, why seventy-five cents, the contract says twenty-five cents." (Armbruster Depo. at 65.) Plaintiff claims that, notwithstanding the issuance of the misprinted contract, he did make an effort to collect the required $0.75 surcharge.

With respect to the Lake Erie Ballet contract, Plaintiff admits that this contract likewise mistakenly indicated only a $0.25 surcharge. Plaintiff maintains that, when the error was discovered, he informed the Lake Erie Ballet of the mistake and the fact that $0.75 would actually be levied. The latter then objected and went directly to Laura Eaton who, over Plaintiff's objections, settled on $0.50 per ticket and directed Plaintiff to charge only that amount. Plaintiff argues that, here again, he made an attempt to collect the $0.75 surcharge but was undermined by Eaton.

With respect to the PIAA contract, Armbruster states that the contract was ultimately settled at $0.75 per ticket. Although the surcharge was waived on all tickets not sold at the gate, Armbruster maintains that this was consistent with past practices of the ECCA. Plaintiff admitted that he does not know how many other contracts, if any, might have gone out with a $0.25 surcharge provision included.[6]

Defendant argues that the foregoing facts, even if taken in the light most favorable to Plaintiff, do not appreciably undermine Defendant's proffered explanation such that a jury could reasonably find it to be pretextual. We agree. The undisputed fact remains that Armbruster, in his capacity as managing director, allowed at least three different contracts to be sent out after January 2, 1992 without the mandatory $0.75 ticket assessment. The fact that these incidents were later resolved and the manner in which the resolution occurred are irrelevant because, in every case, the misprinted surcharge information created problems and/or required intervention by Board members. At least with respect to the Lake Erie Ballet contract, the misprint clearly resulted in a compromise in the amount of surcharge, albeit at Eaton's ultimate direction. With respect to the PIAA contract, a $0.75 surcharge collected only on tickets sold at the gate meant that only 755 of 5,918 tickets were properly surcharged, thus resulting in a substantial loss of revenue. Plaintiff's explanation for relying on this past policy of waiving the surcharge on pre-sold tickets was that "[n]o one ever told [him] that that would be an exception that you'd have to scratch and go from square one." (Unemployment Compensation, hereinafter "UC," Tr. at 40.) There is no evidence that the newly created Board ever condoned this practice and, in fact, aggressive steps were taken in 1992 in the opposite direction toward deficit reduction.

---

6. We note that Defendant also points to a letter Plaintiff wrote on February 26, 1992 to the promoter for the Loblaws Food Show which advised that:

> The Board increased the basic hall rental fees by about ten (10) percent. This new rate is reflected in the enclosed contract. In addition, there is an increase in the service charge per PAID admission. It was 25 [cents] but the increase will be to either 50 [cents] or 75 [cents]. This will be resolved in the very near future.

(Wells Aff. Ex. N.) Armbruster explains this letter by stating that he was unsure at that time what the surcharge price was because in early 1992 there had been discussion by Board members about possibly lowering the assessment to $0.50 per ticket. However, the enclosed contract (bearing a January 26, 1992 issue date) provided for only a $0.25 service charge. Ultimately, only $0.25 per ticket was assessed for this event.

The Court observes that it is unclear from the record whether the Board was aware of—and whether it relied on—this incident at the time of its determination to terminate Plaintiff's employment. Accordingly, as it is unclear whether the Loblaws contract is after-acquired evidence of Plaintiff's performance as managing director, the Court does not rely on it for purposes of this opinion.

The only authorization upon which Plaintiff relied was a casual conversation with one of the Board members, Clarence Metzgar, sometime in the fall of 1991 before the increased surcharge policy was formally implemented. *Id.* This does not constitute formal Board authorization for waiving the surcharge on pre-sold tickets.

### 2. *The Hiring of Tamara Green*

 The second stated reason for Plaintiff's discharge is the hiring of Tamara Green into a permanent part-time position as a bookkeeper in ECCA's accounting department. Green had been a part-time employee working on special events at the Warner Theater before being moved into the accounting department in mid-January 1992 to replace another employee who had resigned. About the time of her move into accounting, Green was given a raise of $1.75 per hour. According to Defendant, this hiring violated the Board's 1992 policy of cutting its deficit by (among other things) imposing a hiring freeze.

Plaintiff admits that he was aware that the Board had implemented a hiring freeze in January of 1992 as part of its cost-cutting measures. He offers two arguments why Green's hiring was not a legitimate reason for his termination. For one, he submits, there was disagreement among board members as to the scope of the hiring freeze—specifically, disagreement as to whether the freeze applied to the hiring of permanent part time employees such as Green and disagreement as to whether it applied to positions filled by current employees. Second, Plaintiff argues that Defendant's purported concern with maintaining the freeze is pretextual because just after Armbruster's termination, the Board itself hired back a former employee in advertising.

The evidence of record, construed most favorably to Plaintiff, indicates that there was some disagreement among Board members with respect to the hiring freeze policy. Clarence Metzgar indicated that the freeze policy meant to him "that no additional employees were to be added to the Civic Center staff." (Metzgar Depo. 30–31.) Metzgar also indicated, however, that not all Board members felt as he did—i.e. some members felt that Green's hiring *was* a violation of the Board's policy. (*Id.* at 32.) Laura Eaton was one such member who felt that, although the freeze was not applicable to part-time employees like ushers and maintenance people, where turnover was high and a full staff needed to be filled quickly, the freeze did apply to permanent positions in ECCA's business office. (Eaton Depo. at 27–28.)

Here again, Plaintiff has failed to seriously challenge the Tamara Green incident as a basis for his termination. The mere fact that Metzgar and/or another Board member felt that Plaintiff's action was consistent with the hiring freeze does not mean that a majority of Board members did not genuinely feel otherwise. In fact, a majority of the Board voted to remove Armbruster by a 7 to 2 vote based in part on this incident.

Plaintiff's second point is that a part time advertising employee was hired back just after Plaintiff's termination, suggesting that the Board was not as concerned with maintaining the hiring freeze as Defendant now claims. However, the fact that the Board took action on one occasion to hire back a particular employee is not necessarily inconsistent with the Board's expressed concern over the fact that Plaintiff unilaterally hired Green without formal Board authorization. In short, the alleged inconsistencies put forth by Plaintiff do not cast sufficient doubt upon the Defendant's second proffered reason for Plaintiff's termination such that a factfinder could reasonably conclude that the reason was a mere fabrication. *Fuentes,* 32 F.3d at 762.

### 3. *The Report of Sean Sullivan*

 Defendant's third proffered reason for Armbruster's termination is the report and recommendations made by Sean Sullivan, which were discussed by the Board at its March, 1992 meeting. It was at the conclusion of this meeting that the Board placed Armbruster on forced vacation status. As noted above, Sullivan's comments in his evaluation were critical of Armbruster's management techniques. Sullivan is a certified public accountant. He was not employed by or affiliated with ECCA, did not know Armbrus-

ter personally, and provided his assessment to the Board on a voluntary basis.

Plaintiff raises several points about Sullivan which he feels support an inference of underlying age discrimination. He observes, for example, that Sullivan was under the age of 40 at the time of Plaintiff's dismissal; Sullivan had little formal training in personnel relations or human resources; Sullivan's assistance was initially obtained for the purpose of providing only financial advice, not personnel advice; Sullivan was not involved in the Green hiring or the ticket service charge issue; Sullivan met Plaintiff on only one occasion; Sullivan did not consult the ECCA personnel handbook in crafting his "performance evaluation" of Plaintiff; Sullivan was advised by a 32 year old board member, Gery Nietupski, to caption his report a "performance evaluation;" and, finally, Sullivan expressed strong opinions about Plaintiff which demonstrate that he viewed Plaintiff as a past relic blocking change.

The Court does not find these factors, either singly or collectively, to be seriously probative of an underlying discriminatory animus. None of the foregoing factors tend to demonstrate either that Sullivan's report was requested or rendered for discriminatory reasons, or that the Board did not actually rely on that report. The mere fact that Sullivan was under the age of 40 at the time is not significant; even if Sullivan had operated with a discriminatory animus, there is no evidence that he had any involvement in the actual decision to terminate Armbruster. *See Ezold v. Wolf, Block, Schorr and Solis–Cohen*, 983 F.2d at 545 ("[s]tray remarks by non-decisionmakers or by decisionmakers unrelated to the decisional process are rarely given great weight, particularly if they were made temporally remote from the date of decision"). Cf. *Armbruster, supra,* 32 F.3d at 783 (age-related statements could not be disposed of as "stray remarks" in pretext case where statements were made by deci-

sionmakers and personnel immediately involved in allegedly discriminatory transfers and were made around the time of adverse employment action.) For the same reason Sullivan's comments at deposition, even if they had been discriminatory in nature—and this Court is unwilling to say that they were [7] —would be irrelevant absent some evidence that his views were shared by the Board and that they formed the basis for the Board's decision to oust Armbruster. Similarly, the mere fact that Attorney Nietupski was 32 years old at the time of requesting the performance evaluation is insignificant absent some additional evidence that Nietupski or other Board members were motivated by age bias.

Plaintiff also points to Sullivan's admission that, from his earliest involvement in January of 1992, it was apparent that the position of operations manager, then held by Casey Wells, would have to be eliminated. Plaintiff finds it significant that Sullivan discussed the need to eliminate the operations manager position *with Wells* rather than with Armbruster. According to Plaintiff, this is indicative of a plan in early 1992 that Armbruster would be eliminated and Wells would be kept on in his stead. As an initial matter, the Court does not view the mere discussion between Sullivan and Wells concerning *Wells's* position as necessarily indicative of a plan to oust Armbruster. More importantly, however, Sullivan's actions are less relevant inasmuch as he was not the "decision maker" in the determination to discharge Plaintiff. Even if there *was* a plan to remove Armbruster, the Court finds no evidence in the record suggesting that such a scheme would have been motivated by Armbruster's age, as opposed to his generally poor performance as managing director.

Nor does the Court see anything so unusual in the procedures utilized by the Board as to cast serious doubt on Defendant's allegation that the Board relied on Sullivan's re-

---

7. Sullivan made certain comments during his deposition to the effect that Armbruster was "not open to try new things," operated seven to ten years "in the past," lacked skills to change "for the future," was a "closed cabinet" and was a "glaring stumbling block" to improvement. (Sullivan Depo. at 41, 43, 59, 60, 63.) Plaintiff points to these comments as indicative of Sullivan's view that Plaintiff was a past relic blocking change. The Court views these comments as being age-neutral, as they pertain more to Armbruster's alleged lack of progress than his age per se.

port and recommendation in deciding to fire Plaintiff. Plaintiff points to several factors supposedly supportive of a finding of pretext: the fact that Sullivan was ostensibly only to render *financial* advice, yet eventually drew up a *performance evaluation of Armbruster*; the fact that Sullivan did not consult the ECCA handbook on personnel matters and bypassed the Personnel Committee; the fact that Plaintiff was not confronted with the ticket surcharge issue prior to termination and was immediately placed on forced vacation status; the fact that Wells's position was eliminated, yet Wells was then moved into the managing director job; the fact that Armbruster's question as to why he was placed on forced vacation status was not answered. Although these factors indicate that some irregularity may have occurred and that official procedures may not have been followed in terminating Plaintiff's employment, they are not materially probative on the crucial issue before the Court: namely, whether there is any evidence sufficient for a jury to reasonably conclude that Defendant did not actually rely on Sullivan's report in terminating Plaintiff and/or that age discrimination was the true reason. We are guided by the language in *Fuentes*, under which Plaintiff must demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence.'" 32 F.3d at 765. We do not believe that this burden has been met.

Finally, Plaintiff alleges that the issue of age was explicitly introduced as a factor in the decision to terminate him during an April 28, 1992 Board executive session. At that meeting, Mr. Metzgar expressed the opinion that it would be unfair to terminate Plaintiff, given Plaintiff's past sacrifices and efforts:

My feeling was that somebody who had this much loyalty to the Board and putting that many years of hard work deserved better treatment, particularly as he was reaching the age of Social Security and retirement, et cetera, that to ruin him at this time was, in my opinion, a very cruel and unnecessary—unless he had done something that I didn't know about and I

had mentioned that in prior testimony, I said if you show me that he did something illegal or immoral or—et cetera, et cetera, then I have no problem with that. But for those reasons I said that I just could not go along with the dismissal.

(Metzgar Depo. at 63–64.) The most that this excerpt illustrates, however is that the Board dismissed Armbruster despite his age, not because of it. The central undisputed fact remains that, during Armbruster's tenure as managing director, the Civic Center continued to lose money to the point where Sullivan, a neutral third party and professional accountant, advised that the place was "bleeding to death." Plaintiff himself admitted at deposition that he can point to no evidence indicative of age discrimination in the Board's decision:

Q. What causes you to believe that age had any bearing upon your termination?

A. Because I was replaced with my assistant who is thirty years my junior.

\* \* \* \* \* \*

Q. Is there any basis for your belief that age played a part in your termination, other than the fact that Casey Wells is younger than you and he now has your job?

A. You mean if I—did I hear somebody say—

Q. No, anything that you would rely on as being an indication—

A. No.

Q. —that you were terminated because of age?

A. No, just that gut feeling that you had when you pick up snatches of conversation here and there and I, you know, you get to a point after a while you look at somebody standing behind you with a knife.

Q. When you were talking about the snatches of conversation before, you mentioned the [sic] someone, somewhere, told you that [Casey Wells] was your heir apparent. Any other snatches of conversation that you can recall?

A. No.

(Armbruster Depo. at 100–02.)

Q. Are there any witnesses you feel would support your contention that age was the motivation for your termination?

A. I can't answer that either, I don't know. I've never discussed that with them.

Q. With anybody?

A. Nope.

(*Id.* at 106–07.)

We are mindful here again of the directive set forth in *Fuentes:*

> the plaintiff generally must submit evidence which: (1) casts sufficient doubt upon each of the legitimate reasons proffered by the defendant so that a factfinder could reasonably conclude that each reason was a fabrication; or (2) allows the factfinder to infer that discrimination was more likely than not a motivating or determinative cause of the adverse employment action.

32 F.3d at 762. Upon review of the entire record, the Court finds insufficient evidence such that a jury could reasonably conclude that age-based animus was more likely than not a motivating cause of Armbruster's discharge. Similarly, we find that Plaintiff has failed to point out inconsistencies, implausibilities, or contradictions in Defendant's proffered explanation for the termination such that a jury could reasonably conclude that each of the reasons proffered by Defendant as a basis for Plaintiff's discharge was in fact a fabrication. Accordingly, Defendant's motion for summary judgment on the ADEA claim will be granted.

**B. Plaintiff's PHRA Claim**

For his second cause of action, Plaintiff alleges that his termination was in violation of the Pennsylvania Human Relations Act, 43 Pa.Stat.Ann. §§ 951 *et seq.* Like the ADEA, the PHRA makes it unlawful for any employer to discharge or otherwise discriminate against an employee with respect to compensation, hire, tenure, terms, conditions or privileges of employment on the basis of (among other things) age. *Id.* § 955(a).

We need not review Plaintiff's PHRA claim in great detail, because pretext cases under the PHRA are analyzed under the same legal framework as Title VII and ADEA claims. *See Griffiths v. CIGNA Corp.,* 988 F.2d 457, 469 n. 10 (3d Cir.1993); *Daly v. Unicare Corp.,* 68 F.E.P. 208, 211 n. 7, 1995 WL 251385 *8 (E.D.Pa.1995); *Allegheny Housing Rehabilitation Corp. v. Pennsylvania Human Relations Comm'n,* 532 A.2d 315, 317–19 (Pa.1987). For the reasons previously discussed under part A above, Plaintiff's age discrimination claim under the PHRA cannot survive summary judgment.

Judgment will therefore be granted in favor of Defendant with respect to Armbruster's second count.

**IV. CONCLUSION**

In sum, the Court finds that the record, when examined as a whole, lacks evidence sufficient to create a genuine issue as to whether Defendant's proffered reasons for Armbruster's termination were fabrications and a mere pretext for age discrimination. We will therefore grant summary judgment in favor of Defendant, the Erie Civic Center Authority, on both of Plaintiff's claims.

An appropriate order follows.

**ORDER**

AND, NOW, this 30th day of September, 1995, for the reasons set forth in the accompanying Memorandum Opinion, IT IS ORDERED that the Defendants' Motion for Summary Judgment [Doc. No. 23] is GRANTED. JUDGMENT is hereby entered in favor of the Defendant, Erie Civic Center Authority, and against the Plaintiff, Jay M. Armbruster.

Before: SLOVITER, Chief Judge, SAROKIN and OAKES *, Circuit Judges.

---

* Honorable James L. Oakes, United States Court of Appeals for the Second Circuit, sitting by designation.

## JUDGMENT ORDER

After consideration of the contentions raised by appellants, it is

ADJUDGED AND ORDERED that the judgment of the district court dated September 30, 1995 be and the same is hereby affirmed for the reasons expressed by the district court.

Costs taxed against appellant.